David R. Weiner, San Antonio, for appellant.

Thomas F. Lee, Dist. Atty., Del Rio, for appellee.

**Lorenzo URDIALES, III, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 04–87–00168–CR.**

Court of Appeals of Texas,
San Antonio.

May 18, 1988.

OPINION

Before ESQUIVEL, BUTTS and CANTU, JJ.

CANTU, Justice.

Appellant was indicted by a Val Verde County Grand Jury for the offense of theft, $20,000 or more, in a three count indictment.

The second and third counts were eliminated when the trial court granted appellant's motion to quash based on the omission of the essential allegation that the appropriation was "without the owner's effective consent."

Trial was before a jury upon an allegation that the theft was committed by appellant by obtaining property without the effective consent of the owner because the owner, by reason of mental disease or defect, which was known to appellant, was unable to make reasonable property dispositions. *See* TEX.PENAL CODE ANN. §§ 31.04(4)(C) (Vernon 1974), 31.03 (Vernon Supp.1988).

A verdict of guilty was returned and punishment was assessed by the jury at seven years' confinement, probated and a fine of $1,000.00.

Appellant argues the same contention on appeal as urged at the trial level; that the evidence is insufficient to support a conviction because the State failed to show beyond a reasonable doubt that appellant knew that the complainant was unable to make reasonable property dispositions by reason of mental disease or defect.

The scenario unfolds with the placing of a phone call by appellant from San Antonio to the bank officers at the Del Rio National Bank on May 5, 1986. Appellant informed the officials that he would be travelling to Del Rio that day for the purpose of cashing a check in the amount of $30,000.00. Sometime between 4:30 p.m. and 5:00 p.m. appellant arrived at the drive-in portion of the bank with a check in the amount of $30,000 made payable to him by the complainant. Appellant's identification was obtained and the complainant's signature was verified along with the sufficiency of funds to cover the amount of the check.

Bank teller, Anna Castillo, handed $30,-000.00 in United States currency to appellant while appellant revealed his urgency to return to San Antonio for the purpose of catching a plane flight from San Antonio to Florida to purchase real estate there.

Carlos Robles, the vault teller also encountered appellant at the bank transaction. He testified that he was instructed on the morning of May 5th to have ready $30,000 in cash for an individual coming from out of town to cash a check for that amount. When appellant arrived after the close of the main bank lobby, Robles took the money to the motor bank where he turned over the cash to appellant after bank officials had verified the authenticity of the check.

Although appellant appeared alone, he mentioned to Robles that Leona Stone, the complainant, was with him in the car. He also volunteered that the complainant's husband, Joe B. Stone, Sr. had died the day before. Robles also related that he had attempted to convince appellant to accept a cashier's check for a part of the money but that appellant would not agree to it. According to Robles, appellant was in a hurry to return to San Antonio to catch a plane flight to California. Robles expressed surprise to see appellant in the main lobby of the bank the next day.

Police officer Richard Fernandez of the Del Rio Police Department testified that he had stopped appellant for a speeding violation at approximately 5:50 p.m. on May 5, 1986 on U.S. Highway 90 East, towards San Antonio. According to Fernandez, appellant claimed to be on an emergency run en route to San Antonio to attend funeral services. He also identified a female passenger as the widow of the deceased.

Ann Schueler, vice president and cashier at the bank testified that she had become acquainted with Joe B. Stone, Sr. and his wife, the complainant, over the years when they resided in Del Rio and maintained an active account at the bank. Schueler described Mr. Stone as being very frugal with his money. According to her, Mr. Stone wrote very small checks very infrequently.

Schueler described her meeting with appellant on May 6, 1986, the day after the $30,000.00 check was cashed. Schueler met appellant in the main bank lobby when appellant returned to cash a second check in the amount of $24,000.00 payable to him and made out once again by the complainant. Again appellant's identity was verified and the maker's signature compared with the signature card. Following a meeting in the office of James Fagan, the senior vice president, appellant produced a power of attorney executed by the complainant on May 5, 1986, and appointing appellant and his wife as her attorneys-in-fact. An attempt to contact the complainant by phone was fruitless and because the check appeared to be authentic it was ultimately cashed.

Both Schueler and Fagan remembered appellant stating that he was employed by USAA Investment Company in San Antonio and that he was investing the proceeds of the two checks on behalf of the complainant. The personnel records supervisor for USAA refuted appellant's claim to be an employee of the investment branch of USAA. Records revealed that appellant had been employed by the insurance company as a maintenance worker and as a carpenter.

Schueler further testified that appellant had shown her a third check on Stone's account that was blank except for the complainant's signature. According to Schueler, appellant wanted to close the account with that check but was refused.

Testimony regarding circumstances occurring subsequent to the cashing of the checks revealed the following.

On May 12, 1986, appellant reported what he claimed to be a burglary at his residence in San Antonio. City police officer Alfred A. Soto, Jr. testified that he was dispatched to the scene where he met the appellant who informed him that he had discovered a large amount of cash totalling $54,000.00 missing from a closet at his home upon his return from a Las Vegas trip. The officer noted the removal of an interior closet door but otherwise saw no evidence of a forced entry. While at appellant's residence, Officer Soto spoke to appellant's wife on the phone as she called from her attorney's office. When Officer Soto asked her about the missing money, she replied that she knew where it was but declined to give further information. Officer Soto decided to carry his report as a family disturbance rather than as a burglary.

Jack Carpenter, a San Antonio lawyer, testified that he was representing appellant's wife in a divorce proceeding filed against appellant sometime in May of 1986. Carpenter recalled that on the day appellant's wife came to his office to discuss the obtaining of a divorce, he spoke to appellant over the phone concerning the complainant's money. He further recalled briefly speaking with the police officer investigating an alleged burglary at appellant's house. Finally, he recalled advising appellant to return the complainant's money to him by the next day or he would report the matter to the Bexar County District Attorney.

Later that evening appellant appeared at Carpenter's office with $18,000.00 which he claimed that he planned to invest for the complainant. The money was left with Carpenter and subsequently turned over to the probate court through the lawyer handling the administration of Stone's estate.

The complainant did not testify. Her medical condition was established through the testimony of Jo Ann Stone, who is the complainant's stepdaughter-in-law, and Dr. Robert Kalter, a San Antonio psychiatrist who had treated the complainant for a few years.

Jo Ann Stone testified she and her husband Joe B. Stone, Jr. lived in San Antonio, as did the complainant and her husband. She recalled visiting the elder Stones on occasion and never witnessing the complainant make a decision regarding the household. She felt certain that all the financial decisions and other matters involving money were made by the complainant's husband during his lifetime.

Although the elder Stone died on May 3, 1986, Jo Ann Stone and her husband did not learn of the death until May 28, 1986. When they learned of it, they drove to the complainant's house and found her in the front yard of the home of her next-door neighbors, appellant and his wife. At some point they learned that the complainant had been staying at the appellant's house since the death of her husband.[1] Thereafter, the complainant moved in with Jo Ann and her husband and remained with them for about two-and-a-half months until she was admitted to an adult assisted living center, or limited-care facility where she remained until the time of trial.

While living with Jo Ann, the complainant was taken to Dr. Robert Kalter, a psychiatrist who had been treating the complainant.

Jo Ann sought appointment as the complainant's limited guardian and was qualified in that position by court order. While she observed the complainant, she noted that the complainant's behavior was not normal. She further noted that the complainant's only decisions were limited to whether she needed a bath and what she would wear.

Sometime in October of 1986, Jo Ann took the complainant to a lawyer's office to

---

1. [Defense Counsel]  Q: Did you ask Mrs. Stone at that time back on May 28 where she had been staying?

      *     *     *     *     *     *

A: Leona mentioned that she was spending the night next door on the floor at Beatrice's house, yes.

execute a will. It was shown through the testimony of the lawyer who prepared the will that in his opinion she was of sound mind and possessed the testamentary capacity to execute a will.

Dr. Kalter testified that the complainant had been his patient since December of 1984. According to Dr. Kalter, the complainant had been suffering from chronic schizophrenia for over thirty years. The disease, in the complainant's case, manifested itself in symptoms which included withdrawal, inability to relate to other people, flat affect,[2] paranoid ideation,[3] unusual thinking, and a poverty of thought.[4] Dr. Kalter described the complainant as being simple-minded.

According to Dr. Kalter, as chronic schizophrenia progresses the person becomes more withdrawn and dependent upon an outside support system. In his opinion, the complainant was deteriorating slowly, but he believed that the death of the complainant's husband had precipitated a "psychotic decompensation" and had deprived her of the structure in her life and someone to monitor her needed medication. When first observed by the doctor and before being admitted into the limited-care facility, the complainant had stopped taking her medication and had become psychotic.

According to Dr. Kalter a normal person would perceive the complainant as being different from other people and the complainant would stand out in a crowd, although people would not necessarily know that the complainant was a chronic schizophrenic. Moreover, a person suffering from chronic schizophrenia would not display good judgment characteristics. In the doctor's opinion the complainant was not able to exercise reasonable judgment and make decisions about her financial matters, especially about the investing of a large sum of money. Nevertheless, it was clear that the depth of one's knowledge of the complainant's condition depended upon the degree of contact with her. The evidence disclosed that appellant and his wife, as neighbors, had extensive contact with the complainant and her husband, including the administering of care to Mr. Stone prior to his death and immediate influence over the complainant following the death of her husband.[5]

The question before this Court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Freeman v. State*, 654 S.W.2d 450, 471 (Tex.Crim.App.1983) (en banc) (on motion for rehearing); *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Crim.App.1983) (en banc) (on motion for rehearing).

The evidence, as appellant correctly points out, is circumstantial. Still, the standard of review remains the same as in a case of direct evidence. If the evidence supports an inference other than guilt, a finding of guilt beyond a reasonable doubt is not a rational finding. *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Crim.App.1983) (on motion for rehearing); *Carlsen v. State, supra*.

Neither the appellant nor the State has directed our attention to any reported case addressing the proof required to support a conviction under the theory of theft proscribed under TEX.PENAL CODE ANN. § 31.01(4)(C) (Vernon 1974). Our own research has revealed none.

Appellant, however, analogizes in his argument and draws from the language in

---

2. "... she does not exhibit emotions in the way that most everyone else does. She doesn't have the smile when people—when things are funny; she doesn't cry when things are sad."

3. "... ideas that people are trying to do something to her."

4. "... her thinking is not very complex. She tends to be fairly simple in her thinking."

5. [Defense Counsel] Q: So you don't know— for instance, are you saying that you are not aware that Lorenzo Urdiales and his wife Beatrice Dallas were providing some care and looking after Joe Benton Stone and Leona?

A: I did not take notice that at the time, no.
Q: Do you now know it, that that was the case?
A: Only from my mother-in-law, Leona.

*Garcia v. State,* 661 S.W.2d 96, 98 (Tex. Crim.App.1983) (en banc), a rape case arising under former TEX.PENAL CODE ANN. § 21.02(a), (b)(4) [For current version, *see* TEX.PENAL CODE ANN. § 22.011(a)(1), (b)(4) (Vernon Supp.1988)]. We agree that the language in *Garcia* is instructive, but we are of the opinion that appellant cannot find consolation in it.

TEX.PENAL CODE ANN. § 21.02(a), (b)(4) provided:

> (a) A person commits an offense if he has sexual intercourse with a female not his wife without the female's consent.
>
> (b) The intercourse is without the female's consent under one or more of the following circumstances;
>
> (4) he knows that as a result of mental disease or defect she is at the time of the intercourse incapable either of appraising the nature of the act or of resisting it.

In answering the question of whether the appellant knowingly engaged in conduct proscribed by the statute, the court of appeals observed "that the complainant had all of the outward appearances of a normal appearing 26 year old [sic] female, and that any mental deficiency she might have had was obviously latent and unobtrusive to persons who did not have a close and personal relationship with her." *Garcia,* 661 S.W.2d at 98.

The pivotal issue appears to be whether the accused has had sufficient opportunity to learn of the condition of the complainant. *Cf. Sanchez v. State,* 479 S.W.2d 933, 941 (Tex.Crim.App.1972).

Evidence of opportunity may manifest itself in instances of access to the complainant through protracted time periods. *Cf. Smith v. State,* 555 S.W.2d 747, 749 (Tex. Crim.App.1977). Knowledge of the complainant's condition may likewise be obtained from the appearance of the complainant.

In the instant case there is ample evidence that appellant, as a neighbor of the complainant, knew the complainant and her husband for period of time, that he had extensive contacts with the complainant through the care he provided for complainant's husband before his death and that he had immediate contact with the complainant at the time of her husband's death [6] when she ceased all medication and lapsed into what Dr. Kalter described as "psychotic decompensation."

We believe that the jury was justified in finding that the appellant knew of the condition of the complainant at the very time appellant obtained the check made the basis of the prosecution. *Garcia v. State, supra* simply does not support appellant when compared to the facts in the instant case.

Another case similar to *Garcia* but unlike the instant case is *Harris v. State,* 474 S.W.2d 706, 708 (Tex.Crim.App.1972). Therein it was observed that the appellant had never seen the complainant before she approached his car on the occasion in which he assaulted her. It was also observed that the complainant, although mentally retarded, could give the appearance of being normal, especially to one meeting her for the first time. Thus, the instant case differs in that appellant had ample opportunity to learn of complainant's condition.

We find both *Harris* and *Garcia* unpersuasive and hold that, under the circumstances in this case, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.

The judgment of the trial court is affirmed.

---

ESQUIVEL, Justice, dissenting.

The issue presented by this appeal is the sufficiency of the evidence to prove lack of

---

**6.** [Defense Counsel] Q: Do you know who it was who took care of the funeral arrangements?

A: After talking to the funeral home I believe Beatrice Dallas paid for the funeral.

> \*     \*     \*     \*     \*     \*

Q: Speaking of legal documents, are you aware, and again, either you know or you don't know, but are you aware that just after Joe Benton Stone died, that Leona Stone executed a power of attorney to Mr. Lorenzo Urdiales and to his wife Beatrice Dallas?

A: I'm aware of it now, not then.

effective consent on the part of the complainant by showing that appellant knew that the complainant was unable to make reasonable property dispositions by reason of mental disease or defect at the time the complainant executed the check in question payable to appellant.

Viewing the evidence in the light most favorable to the verdict I can not reach the conclusion that the majority has reached, i.e., that the evidence excludes every other reasonable hypothesis except the guilt of appellant. In my opinion the evidence is insufficient to support a finding beyond a reasonable doubt that appellant knew that the complainant was unable to make reasonable property dispositions by reason of mental disease or defect at the time she wrote the check in question.

The majority has concluded that appellant knew that the complainant was unable to make reasonable property dispositions by reason of mental disease or defect because appellant had sufficient opportunity to learn of the condition of the complainant and that this opportunity manifested itself in instances of access to the complainant through protracted periods of time. Additionally, the majority states that appellant's opportunity to learn of the complainant's condition stems from the appearance of the complainant. The evidence in this case refers only to appellant's care of the complainant's husband sometime before his death. There is no evidence of any immediate contact between the appellant and the complainant at the time of her husband's death as declared by the majority other than that the appellant had the complainant in the care at the time he was cashing the check in question. There is no evidence that the complainant ceased all medication at the time of her husband's death or that she had ceased all medication at the time she wrote the check in question as declared by the majority; finally, there is no evidence that the complainant was living with the appellant at the time she wrote the check in question, as declared by the majority. Therefore, I cannot agree with the majority in their conclusion that the jury was justified in finding that appellant had the knowledge required for a finding that

he acted without the complainant's effective consent. I agree with appellant that "the jury's finding of guilt is not a rational finding."

Accordingly, I respectfully dissent and would hold that the judgment of the trial court be reversed and the cause be remanded for entry of a judgment of acquittal under the provisions of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).