The defendant, Emil Dempsey "Rick" Gunaca, was charged in a two-count indictment with grand larceny and buying, receiving, and concealing stolen goods. The indictment reads, omitting the formal parts:
 "Emil Dempsey Gunaca . . . feloniously took and carried away one boat of the value of TWELVE THOUSAND DOLLARS, and one trailer of the value of ONE THOUSAND DOLLARS, the personal property of Barney Padgett Marine, Inc., a corporation,
 "2nd: . . . Emil Dempsey Gunaca . . . did buy, receive, conceal or aid in concealing one boat of the value of TWELVE THOUSAND DOLLARS and one trailer of the value of ONE THOUSAND DOLLARS the personal property of Barney Padgett Marine, Inc., a corporation, knowing that they were stolen and not having the intent to restore them to the owner . . ."
The defendant entered a plea of not guilty upon his arraignment. Trial was held on March 5 and 6, 1979, and the jury returned a verdict of "guilty of grand larceny *Page 592 
as charged in the indictment and fixed the value of the stolen property at $13,000.00." Sentence was set at four years in the State penitentiary. The defendant gave an oral notice of appeal. The defendant was represented by counsel of his choice at arraignment and trial. Said counsel, James F. Burford, III, and the Honorable L. Drew Redden represent the defendant on appeal.
Horace W. Thrasher was the manager of Barney Padgett Marine, Inc., in Irondale, on May 20, 1978. The store is located at 1907 Crestwood Boulevard, which is in Jefferson County. On that day, Saturday, Thrasher left work between 6:00 and 6:30 p.m. after having checked all the locks and gates to the building and abutting fenced compound. Prior to his departure the boats on display outside the fenced compound were placed inside the compound.
The following Monday, May 22, 1978, Thrasher arrived at the store at approximately 8:00 a.m. When he arrived the person responsible for returning the boats to their display areas outside the fenced compound reported that his key would not unlock the front gate to the compound. Thrasher went to the gate and discovered that the gate was locked with a lock other than the one Thrasher had previously used to lock the gate. Thrasher's key did not fit the lock. He called the police because he immediately noticed that a boat was missing. This boat was described as being a ". . . tan and beige or brown boat, Century, approximately twenty-one feet in length on a tandum Tennessee drive-on trailer." The boat had an inboard-outboard Mercruiser propulsion unit. This large boat was usually the first boat taken out of the compound in the mornings and the last put back in at night and thus should have been located just inside the gate. When the police arrived they cut the lock from the gate and entered the compound. The boat in question was nowhere to be found.
Thrasher checked his records and ascertained that the identification number for the boat was CEB 8R 191-M78-F and for the trailer, GH-001096, Model 3600-23. The boat and trailer were valued at $12,000 to $13,000 and $1,000 respectively.
Thrasher testified that he did not know Allen Eades, Eva Karen Tew, Emil Gunaca, or Rick Gunaca. He stated that he had never seen the defendant prior to May 19, 1978. Thrasher further testified that neither he nor anyone in his presence or to his knowledge had given anyone else permission to remove that boat from the compound.
On cross-examination Thrasher testified that when the boat disappeared there were no salesmen working for him, only ". . . a mechanic and two boys in the back and none of them had keys." He stated that he did not have a salesman by the name of Bill Gilbert nor had he ever heard of a Bill Gilbert. Thrasher testified that it was common for boats to be without a propeller unless they are ". . . ready for sale . . . fully servicable."
Walter Wall is the manager of the Point Clear Marina in Baldwin County and was so employed on July 6, 1978. On that day a man who identified himself as Allen Eades of Jasper, Alabama, asked Wall about renting a slip for a boat that he wished to sell. Eades was accompanied by a female. Wall identified the defendant in court as the man who called himself Eades. Wall rented the defendant a slip on a day to day basis. The defendant filled out a card with his name and address which Wall later gave to the police department. The defendant stated to Wall that he intended to advertise the boat in the newspaper. The following day, July 7, 1978, the defendant returned to put the boat in the water where it remained until the defendant was arrested.
Jerry Anderson is a sergeant with the Fairhope Police Department and was so employed on July 17, 1978. On that day Anderson went to the Point Clear Marina and after talking with Wall, he went to the boat stall where he saw a twenty-one foot Century boat. The boat was brown and tan with an inboard-outboard engine. Wall had pointed this boat out to Anderson. Anderson boarded the boat to look for the boat's serial number. He could not find the number *Page 593 
then but was able to do so after the marina police told him where to look. After calling the marina police, Anderson boarded another boat and pulled it around behind the boat in question where he found the number CEB 8R 191-M78-F near the water line. The number was located on the rear starboard side of the boat which was the side of the boat opposite the walkway. Anderson located the trailer which was in the parking area. The number on the trailer was GH001096.
After locating these serial numbers Anderson checked these numbers with the computer which indicated that these items were stolen from Irondale, Alabama. Anderson then contacted Horace Thrasher who gave him a general description of the boat stolen. The marina police went to the marina and disabled the boat after Anderson notified them of its location. The boat was registered by Eva Karen Tew. The defendant was arrested on July 20, 1978. Anderson first saw him on that day as the defendant stood in the parking area of the marina. The defendant and Miss Tew were taken to the police department and were placed under arrest there.
Elbert Tarver is a patrolman with the Fairhope Police Department and was so employed on July 20, 1978. On that day he went to the Point Clear Marina around 9:30 a.m. He went to the slip where the boat in question was docked and there he found the defendant and a female. Officer Tarver asked the defendant and the woman to get off the boat. After they complied, Tarver asked the defendant who owned the boat. The defendant replied "a friend." Tarver asked him why he was on the boat and the defendant stated that he was just looking. Tarver asked for and received the defendant's driver's license. Shortly thereafter Tarver and Anderson took the defendant and Miss Tew to the police department.
The State rested its case at this point. The defendant moved to exclude the State's evidence for failure to prove a prima facie case of either count of the indictment. The motion was overruled.
Stephen Frank Weller of Apartment 27, Bent Tree Apartments, Tuscaloosa, manages the cafe and lounge in Tuscaloosa named Solomon's. He has known the defendant for the past eight or ten years. On May 20, 1978, Weller and the defendant were together at Weller's property on Lake Tuscaloosa. They arrived around noon and left around dark, maybe 7:00 p.m. They fished some and generally cleaned up around a picnic table. Upon leaving the lake property Weller and the defendant proceeded back to the apartments. They stopped en route for some barbeque at Archibald's in Northport, an establishment well known for its excellent food and its atmosphere. Weller and the defendant arrived at Weller's apartment around 8:00 p.m. After they arrived Weller stated that Eva Karen Tew drove up with a boat in tow. He described the boat as being about twenty feet long, light in color with an inboard-outboard engine. Weller stated that the defendant ". . . was, I think, sort of surprised, to see her pulling up with a big boat." Tew drove up around 9:00 or 9:15 p.m. Later that night Weller said that the defendant and Tew came to Solomon's where they stayed until after closing, some time after 1:00 a.m. When Weller returned to the apartment around 3:00 or 4:00 a.m., the boat and the couple were not there. They had left the boat there earlier in the evening before they came to Solomon's.
On cross-examination Weller testified that Miss Tew stated that she bought the boat from someone in Birmingham. Weller never saw the boat again although he and the defendant talked about how nice it would be to go out in it. Weller stated that the defendant always referred to the boat as belonging to Miss Tew.
The defendant testified in his own behalf. He stated that he lives with his mother at 1901 Fifth Avenue, East, in Tuscaloosa and is married to Eva Karen Tew. They were married in September of 1978. He testified that he was with Weller on May 20, 1978, at Weller's lake property where they fished and cleaned up a bit. He stated that they left the lake at about dark, en route to the *Page 594 
apartments. They stopped at Archibald's, finally reaching the apartments between 8:00 and 9:00 p.m.
After the defendant and Weller arrived at the apartments Miss Tew drove up pulling a large boat, tan or cream in color, on a black trailer. The defendant stated that she was very excited. Miss Tew was uncertain where she would keep the boat and, after some consideration, she decided to take it to her mother's home in Brewton. After she called her mother, the defendant and Miss Tew went to Solomon's where they stayed until after closing time, 1:00 or 1:30 a.m. When they left Solomon's, they got the boat and headed out in the darkness for Brewton. Proceeding slowly they arrived about 7:30 or 8:00 a.m., Sunday. The defendant stated that Miss Tew said that she bought the boat from a Bill Gilbert whom she met in Birmingham and that she paid almost $4,000 for it. At this time the boat did not have a propeller nor had it been registered.
The defendant testified that after leaving Brewton on Sunday afternoon he did not see the boat again until two or three weeks later when they returned to Brewton. In the meantime Miss Tew procured a propeller for the boat and asked the defendant to go with her to try out the boat. On or around July 6, 1978, the defendant stated that he and Miss Tew went to the Point Clear Marina looking for a place to store the boat. The defendant acknowledged meeting with Walter Wall but denied that he filled out any marina registration card. The defendant stated that Miss Tew introduced herself to Wall and then he introduced himself to Wall as Allen Eades. He did so because of domestic problems with his former wife. Defendant said:
 "Well, I had been having domestic problems with my wife — my ex-wife I should say, and I have a son. He was seven years old then. He is eight years old now. And there are only two Gunacas in the phone book in Tuscaloosa. And I didn't want a man, you know, didn't have anything to do with, I wasn't having any business dealings with him myself. I didn't want him calling around there looking for me, because he might call my ex-wife's house and she is pretty jealous."
On cross-examination the defendant denied that he subsequently called Wall. He stated that Miss Tew called Wall instead. He denied discussing the sale of the boat, or the possible advertising of the boat. He denied that Miss Tew remained in the car and reiterated that she talked with Wall also. The defendant was shown State's Exhibit 1 and the defendant acknowledged that the signature appearing thereon in the space provided for the owner's signature was Miss Tew's. Defendant stated that he was with her when she registered the boat in Brewton and stated that she provided the information necessary to register the boat. The defendant testified that when Miss Tew acquired the boat she had taken a leave of absence from her job at the North River Yacht Club in Tuscaloosa but was modeling "some" for Total-Com, Incorporated. The defendant was also employed by Total-Com, Incorporated. He testified that she told him she paid almost four thousand dollars for the boat which she bought from Bill Gilbert.
On cross-examination defendant acknowledged the presence of a pair of bolt cutters in Miss Tew's car. Immediately thereafter he denied any knowledge thereof. The record reveals:
 "Q. [by Mr. Colee for the State] When you all went down there the weekend you were arrested, that July 20, 1978, whose car were you in, please, sir?
"A. Miss Tew's car.
"Q. Would that be a station wagon?
"A. Yes, sir.
 "Q. And whose pair of bolt cutters were in the back seat — were they yours or were they hers?
"A. I don't know whose bolt cutters they were.
 "Q. There were some bolt cutters in the back of that car, were they not?
 "A. I don't know if there were any bolt cutters in the back of that car.
 "Q. Do you deny there being any bolt cutters in the back of that car? *Page 595 
"A. No, I don't deny it. I said I don't know.
 "Q. They were the same bolt cutters you all used to cut the locks off out here at Barney Padget Marine, aren't they?
"A. No, sir.
"Q. They are not the same bolt cutters —
 "A. You are twisting words around here a little bit, sir."
The defendant said that he had never known Miss Tew to use the name Vickie Lynn Johnson. He stated that he did not know if Miss Tew had registered the boat in Bay Minette under the name Vickie Lynn Johnson. He stated Miss Tew told him that she had a bill of sale which was in Tuscaloosa on July 20, 1978. When asked whether she had ever produced the bill of sale for inspection by the police, defendant stated that she had not produced it to his knowledge, ". . . because they haven't asked for it." He acknowledged that he had never lived in Jasper and that the fake name and address ". . . just popped up in my mind. . . ."
At the conclusion of the State's cross-examination of the defendant the defense rested and moved for the affirmative charge. The motion was overruled.
Defendant presents six issues for review.
Issue No. 1, "Was the evidence sufficient to support a conviction?", and Issue No. 6, "Was the evidence sufficient to support a conviction under Count 1 of the indictment?", will be addressed together in this opinion.
Issue No. 2. The defendant questions whether the evidence sufficiently proves the corporate existence and identity of Barney Padgett Marine, Inc., a corporation, as alleged in the indictment.
§ 12-21-201, Code of Alabama, 1975, is pertinent and states:
 "In the trial of criminal cases it shall not be necessary for the state to prove the incorporation of any corporation mentioned in the indictment, complaint or information unless the defendant, within 30 days after indictment if the defendant is under bond or within 30 days after arrest on capias, denies the existence of such corporation by a sworn plea."
A search of the record does not reveal any such sworn plea by the defendant. When § 12-21-201 is not complied with the State is relieved of the burden of proving a corporation and the defendant cannot complain of the state's failure to prove its legal character. Klemmer v. State, 51 Ala. App. 383,286 So.2d 58, certiorari denied, 291 Ala. 786, 286 So.2d 62 (1973),416 U.S. 957, 94 S.Ct. 1972, 40 L.Ed.2d 308. Rupert v. State,45 Ala. App. 84, 224 So.2d 921 (1969).
The defendant relies on Graham v. State, 46 Ala. App. 608,246 So.2d 675 (1971), in support of his position. That case may be distinguished from this case. In Graham, the indictment laid the ownership of the property alleged to have been stolen in Weatherly Plumbing Co., Inc., a corporation. Hugh Weatherly, the owner and manager of "The Weatherly Plumbing Company," testified for the state. The only reference to the corporation named in the indictment came when Mr. Weatherly testified on direct examination.
 "Q. . . . Were any of these articles in any boxes or containers or cardboard containers or any kind of container with the name Weatherly Plumbing Company, Incorporated on them?
 "A. Yes, sir. All of them were. They have my name on them when they are shipped in there." [emphasis added]
Testifying further, Weatherly stated:
 "A. . . . They had my name on them and they were the ones that were missing out of the box."
Several other witnesses stated that the boxes of supplies in question, supra, were marked "Weatherly" or "Weatherly Plumbing Company." The court held in Graham that the evidence fell short of establishing either the legal existence of the corporation or the ownership of the alleged stolen supplies in the corporation. This holding stems from the ambiguity of Weatherly's testimony. His statement, "They had my name on them . . .", does not clearly establish *Page 596 
whether he was speaking as an individual or as the agent of the corporation.
No such ambiguity occurs in the instant case and clearly, in the absence of compliance with § 12-21-201, reversible error is not present.
Issue No. 3. The defendant questions whether the State's evidence sufficiently proved that the boat allegedly stolen was the property of Barney Padgett Marine, Inc., a corporation.
The State's evidence as presented by the testimony of Horace Thrasher, the manager of Barney Padgett Marine, Inc., is that the boat and trailer were in the possession of the marina and were used for display purposes. The identification number of the boat and of the trailer were kept as a part of the company's records. Thrasher testified that neither he nor anyone in his presence or to his knowledge had authorized the removal of the property in question.
In Rupert v. State, supra, the defendant was charged with larceny of a safe belonging to the Fayette Housing Authority. The defendant in Rupert alleged on appeal that the State failed to establish the ownership of the property alleged to have been stolen and its value. The testimony of the State in regard to the ownership and value of the safe was summarized by the Court as follows:
 "On the question of ownership and value, the State called Mr. Howard Stanley, who testified he was the Executive Director of the `Fayette Housing Authority,' located on Spring Street in Fayette; that in his capacity as such Executive Director he bought all the equipment used in the `Housing Authority,' subject to the approval of the board; that he saw the invoices on every item purchased, and based on such invoice for the safe he would say its value was $242.00; that the safe was used in the office of the Fayette Housing Authority and had a tag on it showing it was the property of the `Housing Authority of the City of Fayette' and that when he saw it at the City Hall after the theft the tag was still on it."
Against the argument that it appeared from the evidence that the safe was purchased by Stanley and was his personal property, the Court held in Rupert that the import of his testimony was that he purchased the safe for the Housing Authority.
Clearly the import of Thrasher's testimony is that the property belonged to "Barney Padgett Marine, Inc."
In Gandy v. State, 35 Ala. App. 299, 46 So.2d 247 (1950), the defendant was charged in a two-count indictment with larceny and receiving stolen goods. The property in question was a flight jacket valued at $19.22. The indictment laid the ownership of this personal property in ". . . H.G. Whigham and R.E. Whigham, partners, doing business as Palace Laundry and Dry Cleaners . . ." At trial the defendant moved to exclude the State's evidence on the ground that the indictment laid the ownership as previously described and that the proof indicated that the partnership did not own the jacket, but merely was in the possession of it. The trial court overruled the defendant's motion, and on appeal the Court upheld the ruling of the trial court, saying:
 "There is no merit to this position. In a larceny prosecution the ownership of the alleged stolen property is properly laid in the person who is in the rightful possession thereof at the time of the theft. Gullatt v. State, 24 Ala. App. 11, 130 So. 169, Fowler v. State, 100 Ala. 96, 14 So. 860, Leverette v. State, 18 Ala. App. 578, 93 So. 347, Viberg v. State, 138 Ala. 100, 35 So. 53, 100 Am. St.Rep. 22."
The defendant's motion was properly overruled and he suffered no prejudicial error thereby.
Issue No. 4. The defendant contends that the evidence was insufficient to prove that the property described in the indictment was in fact stolen. He urges this court to hold that the proof of non-consent was insufficient.
The defendant's argument in chief is grounded upon McMickensv. State, 16 Ala. App. 78, 75 So. 626 (1917) as was reaffirmed *Page 597 
in Eady v. State, 48 Ala. App. 726, 267 So.2d 516 (1972). In his brief, appellant states:
 "In McMickens v. State, 16 Ala. App. 78, 75 So. 626
(1917), the defendant was convicted of larceny of some copper wire and brass. These items apparently were the property of Woodward Iron Company. An employee of the company identified it as being the property of the company. On appeal, the court found that there was no evidence from which the jury would be warranted in saying, beyond a reasonable doubt, that the defendant took the property from the possession of Woodward Iron Company, or if he did so, that such taking was felonious. The opinion contains the following quotation from 1 Mayfield, 579, § 242:
 "`Where non-consent is a principal ingredient in the offense, direct proof alone from the person whose non-consent is necessary can satisfy the rule. Other and inferior proof cannot be resorted to till it be impossible to procure this best evidence. Where the person who last had innocent possession of the property can be called as a witness, some sufficient reason why it is not done ought to be shown.'"
Terse statements of the law shed little light upon questions on appeal without a close examination of the facts to which these statements were applied. In McMickens, the defendant sold to Bumby, a Bessemer scrap dealer, about $100 worth of copper, wire, and brass, including some brass grip shoes and copper wire. These purchases were negotiated in broad daylight, without any indications of stealthiness by the defendant. The facts accompanying the opinion stated that these transactions took place in 1912 and that:
 "One Crawford, an employee of the Woodward Iron Company, as its deputy sheriff, testified that the company claimed to have missed some brass during 1912; that he and another deputy went down to investigate, and found some brass and copper wire that looked like brass the company lost at Bumby's scrap heap; there were three brass grip shoes and $7.50 worth of copper wire; that it was just like the brass and copper junk that had been piled near the washer; that witness could not say the property he found at Bumby's was the property of the company; that there were no marks of identification on it.
 "One Mims, another deputy sheriff employed by the company, testified that at the scrap heap of Bumby he and Crawford found some copper wire (but no brass shoes), which he identified as the property of the company.
 "The defendant admitted selling Bumby 100 pounds of copper wire and scrap brass which he said he bought from a man named Whiskey Bill; that Sterle, the master mechanic for the company, had told defendant they had given Whiskey Bill some of this scrap brass . . ."
The court stated in regard to this evidence:
 "There is no evidence . . . from which the jury would be warranted in saying, beyond a reasonable doubt that the defendant ever took the property . . . or if he did it was felonious. "The agent of the company having this property in charge might have been examined, or at least someone who knew that the property had been in the possession of the company and had been taken without its consent." [Emphasis added.]
This last paragraph quoted above accurately describes the action taken upon the trial of this case. Horace Thrasher, the manager of Barney Padgett Marine, Inc., who supervised the business and conducted it without the assistance of other salesmen testified that the boat was in the possession of the company and that neither he nor anyone in his presence, or to his knowledge, had given anyone consent to remove the boat.
The defendant urges that the evidence reflects that there is a living, breathing person Barney Padgett and that it was necessary to prove his non-consent. The only evidence in the record about this Barney Padgett occurs at pages 18 and 19, during cross-examination of Thrasher: *Page 598 
 "Q. They have to come there — could you state that boat's brand number again, please, sir, I'm not sure about the fourth number or letter, is that eight or A?
"A. CEB 84 191-M78F.
"Q. That fourth digit there, is eight?
 "A. I believe so. I could not be positive without pulling the original invoice.
"Q. You don't have the original records with you?
 "A. No, sir, Barney Padgett has those. He has since he moved his location. If it is necessary, we can get the original invoice."
To say that Barney Padgett's non-consent is essential is purely speculatory. However the unequivocal, undisputed testimony is that the manager of the company did not consent to the removal of the boat. This is sufficient and the court below did not err.
Issue No. 5. The defendant contends that the evidence did not sufficiently prove that the boat recovered was the same boat allegedly stolen.
This contention is absolutely groundless. The boat taken from Barney Padgett Marine, Inc., was described as a Century make, twenty-one feet long, tan and beige in color, and powered by a Mercruiser inboard/outboard propulsion unit. The serial number of the boat was given as CEB 84 191-M78-F. The boat was on a Tennessean tandum trailer with a serial number of GH-001096, Model 3600-23. The property recovered from the defendant is identical in every respect. A jury could reasonably infer from this evidence that the property recovered was the boat taken.
Issues 1 and 6. The defendant contends that the evidence was insufficient to support a conviction under Count 1 of the indictment, grand larceny.
The corpus delicti in larceny consists of two elements: (1) that the property was lost by the owner, and (2) it was lost by felonious taking. Jones v. State, 51 Ala. App. 570,287 So.2d 886; Pate v. State, 36 Ala. App. 688, 63 So.2d 223. The uncontroverted evidence is that the boat and trailer in question were lost by the owner. Whether or not the loss of the property was by a felonious taking may be proved by facts and circumstances as well as by direct and positive evidence and, if the evidence affords an inference that a larceny has been committed, its sufficiency is for the jury and it is their duty to determine whether the corpus delicti has been proven. Jones, supra, Melson v. State, 38 Ala. App. 514, 88 So.2d 851. The circumstances of the removal of the property are sufficient to warrant a reasonable inference that the taking was felonious.
The defendant was found in possession of the property taken from Barney Padgett Marine, Inc. It is a well established rule that the possession of recently stolen goods is a fact from which the jury can legally infer guilt. The reasonableness of the possessor's explanation is for the jury. Klemmer v. State,51 Ala. App. 383, 286 So.2d 58, certiorari denied, 291 Ala. 786,286 So.2d 62; Dickey v. State, 32 Ala. App. 413, 26 So.2d 532.
The defendant states that the undisputed testimony for the defendant places the defendant's first contact with the boat in Tuscaloosa and hence he could not have participated in its theft. This overlooks another well established rule that every person, who, with a guilty knowledge, aids and abets the carrying away is guilty of larceny. Jones, supra, Travis v.State, 32 Ala. App. 637, 29 So.2d 359.
Without dispute the defendant aided in the asportation of the stolen property and his conduct at the Point Clear Marina is sufficient to allow a jury to reasonably and legally infer his guilty knowledge.
The court did not err in overruling the defendant's motions.
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 599