[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 675 
Between May of 1986 and July of 1987, Frances C. Gainer, a beautician at a nursing home earning less than $11,000 per year, obtained $111,000 from 83-year-old Margaret S. Endicott. Gainer was convicted of first degree theft of property, sentenced to ten years' imprisonment (to be served on work release), and ordered to make restitution in the amount of $111,000. Five issues are raised in this appeal from that conviction.
 I
Gainer's first argument is that the state failed to establish a prima facie case of first degree theft.
The state's evidence against Gainer was largely circumstantial. The victim, Mrs. Margaret Endicott, was deceased at the time of trial. This evidence showed that Gainer was employed as a beautician at Tyson Manor Nursing Home from 1977 until July of 1987. She did not serve as a nurse's aide. During the year between July 1, 1986, and June 30, 1987, Gainer's net income from Tyson Manor was $10,680.15.
Mrs. Endicott was a patient at Tyson Manor from October 26, 1984, to November 21, 1984. She was readmitted as a patient on September 19, 1985, following hospitalization for malnutrition. During this hospitalization, she was diagnosed as having Parkinson's Disease. At the time of her second admission to Tyson Manor, Mrs. Endicott had in her possession a $5,000 certificate of deposit and eleven checks which totalled over $3,700. These items were discovered by Tyson Manor personnel on October 14, 1986, and were placed in the nursing home safe. Several of the checks were stale dated and Ms. Mary Tucker, bookkeeper and administrative assistant at Tyson Manor, obtained replacement checks for Mrs. Endicott from the issuers.
Mrs. Endicott remained at Tyson Manor almost ten months. On July 7, 1986, she was discharged and returned to her home. Her doctor agreed to discharge her on the condition that she obtain full-time, in-house care, as she was confined to a wheelchair and was unable to properly care for herself. At the time she left the nursing home, Mrs. Endicott was approximately two weeks shy of her 84th birthday. She was a widow and childless, and had no relatives residing in Alabama. Mrs. Endicott died on July 9, 1987.
Shortly before Mrs. Endicott's discharge from Tyson Manor, Gainer began taking her on outings. Tyson Manor records *Page 676 
show that Gainer "checked her out" on May 15, May 28, June 4, June 17, June 26, and June 27. After Mrs. Endicott's discharge from Tyson Manor, Gainer stayed with her at times. One of Mrs. Endicott's neighbors testified that Gainer said "she was just going to look after Mrs. Endicott because she was practically totally disabled and she was going to stay with her so Mrs. Endicott could be at home." Other sitters were also engaged to care for Mrs. Endicott at the rate of $1,000 per month, although it does not appear that Mrs. Endicott initially had the 24-hour-a-day care deemed necessary by her doctor.
On July 22, 1986, some two weeks after Mrs. Endicott's discharge from Tyson Manor, a joint checking account (the "City Federal account") in the names of "Fran Gainer or Margaret Endicott" was opened at City Federal Savings and Loan Association in Montgomery. The address given for this account was 4055 Strathmore Drive, which was Gainer's address. The signature card/account agreement for this account provided in pertinent part: "This account is a joint account. All sums now on deposit or hereafter deposited in this account . . . shall be owned jointly with the right of survivorship and not as tenants in common. . . ." Certificates of deposit payable to Mrs. Endicott and totalling over $40,000 were closed out and deposited into the City Federal account.
Mrs. Endicott had an individual checking account at First Alabama Bank (the "First Alabama account"). On October 13, 1986, this account was changed to a joint account with Gainer. The signature card for this account indicates that the account was joint with right of survivorship. The account contract on the reverse of the signature card provides in pertinent part: "Deposits to such accounts become the joint property of all Depositor(s)." The bank's "CHANGE OF TITLE — DEPOSIT ACCOUNT" form states as the reason for this change: "Mrs. Endicott has requested because of difficulty in signing checks."
Prior to the change in the First Alabama account, a number of checks payable to Gainer or "Cash" in varying amounts were written on this account and signed by Mrs. Endicott as maker. Subsequent to the opening of the City Federal account and the change in the First Alabama account, funds in these accounts were utilized to purchase various items for Gainer and members of her family. These purchases included a red 1986 Corvette, a 1987 Hunter-23 sailboat, a home computer, a tanning bed, furniture, a refrigerator, a dishwasher, and a number of pieces of gold jewelry. Gainer also utilized these accounts to pay her cable television, telephone, water, and electric bills; to make payments on her MasterCard debt and certain other debts; and to pay automobile insurance premiums and dental bills for herself and members of her family. Mrs. Endicott's utilities and other bills were also paid out of these accounts, along with payments to the various sitters who were engaged to care for her. It appears that Gainer signed the majority of these checks as maker, although Mrs. Endicott also signed some checks from time to time.
Between May 1986 and June 1987, over $185,000 was expended from these accounts. The state alleged that some $111,000 was used by Gainer without Mrs. Endicott's authorization for purchases and expenditures inuring to the benefit of Gainer or her family members. With the exception of $197.29 representing checks payable to Gainer, all of the funds in both these accounts originated from checks payable to Margaret Endicott. These included Veteran's Administration checks, Indiana State Teachers Retirement Fund checks, Social Security checks, checks representing the proceeds of certificates of deposit in Mrs. Endicott's name, and various dividend and interest checks.
Several witnesses, some of whom had been acquainted with Mrs. Endicott for a number of years, described Mrs. Endicott as "very frugal," "tight," "a miser," and a person who "kept close to her money." One of these witnesses stated that Mrs. Endicott's furniture was "poor," and that her clothes were "nice clothes, but real old." While in Tyson Manor, Mrs. Endicott rented a semi-private room rather than a private room, although the monetary difference *Page 677 
was only four dollars per day. It was established that Mrs. Endicott owned a 1975 Chrysler New Yorker and did not have a dishwasher. Several witnesses testified that Mrs. Endicott saved paper towels and tin foil for reuse.
Ola Johnson testified that her mother had worked for Mrs. Endicott and that she had known Mrs. Endicott 27 years, since she (Ola) was a child. Ola had also worked for Mrs. Endicott after her mother retired and had visited Mrs. Endicott at Tyson Manor in order to "do for her." Mrs. Endicott would lend members of the Johnson family money from time to time. In 1985, Mrs. Endicott made a $5,300 loan to Ola so that Ola could purchase an automobile. An agreement embodying this loan was drawn up at a bank. Although Ola made some payments on this loan, she did not repay it in full, as the debt was forgiven in Mrs. Endicott's will. In all the years Ola knew and worked for her, Mrs. Endicott never gave Ola a car, a sailboat, or a home computer, or bought her furniture and jewelry.
Various witnesses testified as to Mrs. Endicott's mental condition after her release from Tyson Manor. Mrs. Endicott often asked about her husband and her mother, both of whom were deceased. She also requested to go upstairs, but lived in a single floor residence. Several times, she requested one sitter to prepare supper for her deceased husband. She once requested another sitter to bring tea into her bedroom and share it with she and her friends, although no one else was there. Ola Johnson testified that Mrs. Endicott was "alert" when she first left Tyson Manor, but her mental condition began to deteriorate thereafter. However, the sitter who began staying with Mrs. Endicott in the summer of 1986 testified that, "[e]ver since I first went there," Mrs. Endicott requested to go upstairs and that her mother be brought out of the back room. A long-time neighbor of Mrs. Endicott's stated that Mrs. Endicott did not always recognize her when she visited Mrs. Endicott at her home. When asked by the assistant district attorney if Mrs. Endicott was of sound mind from the time she left Tyson Manor until the time of her death, this neighbor responded, "Not all the time."
At some point in time after Mrs. Endicott returned to her home, Gainer had Mrs. Endicott's telephone number changed to an unlisted number and also had the locks on Mrs. Endicott's doors replaced. Prior to the locks being changed, several neighbors and Ola Johnson, all of whom Mrs. Endicott had given keys to her house, would frequently check on Mrs. Endicott. In October 1986, Betty McCain, a neighbor, came over to check on Mrs. Endicott and found her alone, semi-conscious on her bed, and lying in her own excrement.
Two of the sitters engaged to care for Mrs. Endicott stated that Gainer instructed them not to give Mrs. Endicott any bank statements. One sitter, Ramona Anderson, stated that this was "because [Gainer] said Mrs. Endicott had lost some important mail." The other sitter, Ann Jordan, also testified that Mrs. Endicott was given medication which Gainer "fixed up in envelopes with the date and time." Additionally, Mrs. Endicott was given Nyquil and "maybe Tylenol" and was often sick and in what Gainer and the sitters referred to as "the zombie stage." Gainer would sometimes ask the sitters "is she [Mrs. Endicott] with it, or is she out of it today, or something like that." Mrs. Endicott's physician, Dr. Joe Jackson, testified that Nyquil contains Tylenol (acetaminophen) and that the effect of this medication on a person with Mrs. Endicott's physical ailments would probably be to make that person somnolent and intoxicated.
Ann Jordan also testified that Gainer had Mrs. Endicott practice her signature on pieces of newspaper. Ms. Jordan told Gainer that Mrs. Endicott needed to go to the dentist because she was frequently biting her lip and that she needed a food processor because she was unable to chew her food. Gainer did not take Mrs. Endicott to the dentist and it was "about a month" before Gainer actually procured a food processor, even though Ms. Jordan asked her several times about it.
Nancy Loreaux, Mrs. Endicott's second cousin who resides in Cincinnati, Ohio, visited *Page 678 
Mrs. Endicott in November 1986. Gainer picked her up at the airport in Mrs. Endicott's car, but Mrs. Endicott was not with her. During this visit, Gainer told Ms. Loreaux that Ola Johnson had attempted to get some money from Mrs. Endicott, but she (Gainer) had been able to prevent it. Gainer also told Ms. Loreaux that "she felt Aunt Margaret's [Mrs. Endicott's] condition had deteriorated to the point where she felt like Aunt Margaret was no longer capable of handling her affairs. So Fran [Gainer] told me that she had begun to write the checks that would pay the bills that Margaret had at that time and also she was paying the girls who were helping Aunt Margaret, taking care of her." Based on her observation of Mrs. Endicott during that visit, Ms. Loreaux stated that she agreed with Gainer's assessment of Mrs. Endicott's inability to handle her financial affairs.
Mrs. Endicott left a will which had been executed in September 1984. This will contained a $50,000 bequest to the trustees of a church, a $25,000 bequest to a scholarship fund, and various significantly smaller bequests to other organizations and to certain individuals, including a long-time neighbor and Ola Johnson's mother. Loans to the Johnson family were forgiven. Marie Endicott, the widow of Mrs. Endicott's husband's brother, and her children were beneficiaries under this will, but there was no bequest to Gainer.
 A
The indictment against Gainer contained two counts: (1) theft by deception under Ala. Code 1975, § 13A-8-2(2) and (2) theft by "[k]nowingly obtain[ing] or exert[ing] unauthorized control over the property of another, with intent to deprive the owner of his property" under Ala. Code 1975, § 13A-8-2(1). At the close of the state's case-in-chief, Gainer made a motion to exclude the evidence. The trial court granted this motion with regard to the deception count and denied the motion as to the unauthorized control count.
It was uncontested that the vast majority of the funds in these accounts derived from sources connected solely with Mrs. Endicott and that Gainer utilized a large portion of the funds in the accounts for the benefit of herself and her family. She contends, however, that the state failed to prove that her use of these funds was unauthorized, that she was not the owner of the funds, or that she knowingly exerted any unauthorized control, all of which are necessary elements of the crime of theft under § 13A-8-2(1). Her position is that Mrs. Endicott, by signing the account signature cards, both authorized and consented to her use of the funds and made her a co-owner of the funds, which negated any knowing wrongdoing on her part. We cannot agree.
 "In reviewing the action of the trial court in overruling a motion to exclude the evidence, only the evidence before the trial court at the time the motion was made can be considered. James v. State, 351 So.2d 693 (Ala.Cr.App. 1977); Livingston v. State, 44 Ala. App. 559, 216 So.2d 731 (1969). The standard of review is whether there exists legal evidence before the jury, at the time the motion was made, from which the jury could by fair inference find the defendant guilty. Stewart v. State, 350 So.2d 764 (Ala.Cr.App. 1977)."
Thomas v. State, 363 So.2d 1020, 1022 (Ala.Cr.App. 1978).
 The state's evidence regarding the elements which Gainer insists were unproved was entirely circumstantial. However, "[t]he elements of theft may be proven by circumstantial evidence." Robinson v. State, 432 So.2d 518, 519 (Ala.Cr.App. 1983). "[I]f the evidence affords an inference that a [theft] has been committed, its sufficiency is for the jury and it is their duty to determine whether the corpus delicti has been proved." Gunaca v. State, 383 So.2d 590, 598 (Ala.Cr.App. 1980). In discussing the proof of a prima facie case of larceny (now theft) in Simpson v. State, 354 So.2d 317, 321
(Ala.Cr.App. 1977), cert. denied, 354 So.2d 324 (Ala. 1978), we noted:
 " '. . . All of these necessary ingredients may be, and most of them usually are, shown by circumstantial evidence, from which the jury, using their everyday *Page 679 
common sense and observation, must draw their conclusions.'
". . . .
 " '. . . We are not unmindful that the corpus delicti may be proved by circumstantial evidence, and if the evidence adduced affords an inference that a larceny [now theft] has been committed, the question of its sufficiency is for the jury. . . .' "
(Quoting Tyler v. State, 17 Ala. App. 495, 496, 86 So. 93, 94
(1920), and Wright v. State, 17 Ala. App. 621, 622, 88 So. 185,186 (1920).)
Nonconsent to the taking of the property is a necessary element in proving a theft. McCord v. State, 501 So.2d 520
(Ala.Cr.App. 1986); Coates v. State, 36 Ala. App. 371,56 So.2d 383 (1952). This element "may be established by circumstantial evidence, as is the case of proof of any other factual issue."Coates, 36 Ala. App. at 373, 56 So.2d at 385. Accord, Crawfordv. State, 479 So.2d 1349, 1354 (Ala.Cr.App. 1985); Hinote v.State, 395 So.2d 116, 118 (Ala.Cr.App.), Ex parte Hinote,395 So.2d 119 (Ala. 1981). We have noted that some prosecutions for larceny (or theft) "may demand direct proof of nonconsent" as "the circumstances incident to the taking are not sufficiently potent to supply this proof." Coates, 36 Ala. App. at 373,56 So.2d at 385. Apparently Eady v. State, 48 Ala. App. 726,267 So.2d 516 (1972), upon which Gainer relies, and McMickens v.State, 16 Ala. App. 78, 75 So. 626 (1917) (both of which indicate that direct proof of nonconsent is necessary), were thought to be such prosecutions. However, when the purported owner is deceased, as in the case at bar, direct proof of that owner's nonconsent is obviously not available. In such a situation, "[i]t is the established rule that lack of consent to the taking of the property may be proven by circumstantial evidence." People v. Shurn, 418 N.Y.S.2d 445, 448, 69 A.D.2d 64
(1979). See generally, 52A C.J.S. Larceny § 135 (1968).
The evidence does show that Mrs. Endicott signed the signature/account agreement cards, which, by their terms, granted Gainer ownership of and authority over the funds in the accounts.[1] However, "an apparent consent is not effective unless, as a factual matter, it is voluntary and intelligent." C. Torcia, 1 Wharton's Criminal Law, § 46 at p. 231 (14th ed. 1978). Several states have adopted statutory provisions vitiating consent obtained from one whom the defendant knows or should know lacks the mental capacity to voluntarily and intelligently give such consent. See e.g., Colo. Rev.Stat. § 18-1-505(3) (1986); Tex.Pen. Code Ann. § 31.01(4)(C) (1974). InUrdiales v. State, 751 S.W.2d 269 (Tex.App. 1988), the defendant's conviction of theft based on obtaining large checks from his neighbor, an elderly, recently widowed, and schizophrenic woman, was affirmed under such a statute.
There is no such provision in Alabama law with regard to offenses involving theft. Compare Ala. Code 1975 §13A-6-70(c)(2) (vitiating consent to sexual acts by persons who are mentally defective). However, we are of the opinion that, even without an express statutory provision to that effect, mental deficiency on the part of the victim, which is known or should be known to the defendant, can render ineffective the apparent consent by that victim in a prosecution for theft under § 13A-8-2(1).
The Georgia Court of Appeals reached the same conclusion inLucas v. State, 183 Ga. App. 637, 360 S.E.2d 12, cert. denied, September 8, 1987, which involved facts very similar to the facts in the present case. The victim was an elderly woman who had begun to exhibit signs of senility at the time the defendant came into her life. The defendant visited her at her home in New York City and "began to assume control over her financial affairs." 360 S.E.2d at 13. The victim subsequently moved to the defendant's home in Georgia. *Page 680 
Thereafter, her mental condition deteriorated rapidly.
The defendant endorsed and cashed the victim's Social Security and retirement benefit checks, received at least one-half the proceeds of the victim's $15,000 savings account which she liquidated before leaving New York, and purchased real estate from the victim at prices significantly below value. "Altogether, it was shown that the [defendant] had controlled well over $40,000 of the victim's money during the two and one-half year period he was 'caring' for her. . . ."Id. When an acquaintance asked what sort of work he did, the defendant stated that "he 'took care of old ladies.'" Id. At the time of trial, the victim was comatose and did not testify.
The defendant was convicted of theft under a statute comparable to § 13A-8-2(1). In affirming the conviction, the court held: "The evidence, considered as a whole, was sufficient to enable a rational trier of fact to find the [defendant] guilty beyond a reasonable doubt of theft by taking," citing the applicable theft statute. Id. at 14. Although the element of nonconsent was not specifically addressed by the court, that element had to exist to sustain the defendant's conviction. See Stull v. State, 230 Ga. 99,196 S.E.2d 7 (1973). From the facts contained in the opinion, it would appear that the element of nonconsent was predicated on the victim's mental deficiency and her resulting inability to give a valid consent, even though Georgia does not have a specific statute to that effect.
When deciding upon the sufficiency of the evidence, the evidence must be viewed in the light most favorable to the prosecution. Ex parte Hinton, 548 So.2d 562 (Ala. 1989). When so viewed, the evidence in this case shows that the victim was an elderly, sick woman, without close family, and of an extremely frugal nature. After her release from Tyson Manor Nursing Home, she was not always mentally acute. She was very vulnerable to being preyed upon by unscrupulous persons. Gainer, apparently aware of the situation, stated that she was going to take care of the victim so the victim could remain at home. A new joint checking account was opened with Gainer. An existing checking account was changed to a joint account with Gainer. Thereafter, large sums of money, which were derived from the victim's investments, past employment, or other sources not connected with Gainer, flowed out of these accounts for the benefit of Gainer or her family. However, Gainer intimated to a distant relative of the victim that she was on the account only to pay the victim's bills and the sitters as the victim was incapable of handling her financial affairs.
In our opinion, the circumstantial evidence presented by the state readily affords the inference that Mrs. Endicott was not mentally competent to understand the nature of the bank account arrangements and that Gainer, like the defendant inLucas, supra, simply "assume[d] control over [Mrs. Endicott's] financial affairs."[2] This would negate both Gainer's claim of authorization and account ownership. The state's evidence also provides a fair inference that Gainer knew Mrs. Endicott was not mentally competent and took advantage of this fact in order to obtain unauthorized control of Mrs. Endicott's funds. We conclude that this evidence was sufficient both to establish a prima facie case of theft under the standards set forth inGunaca and Simpson, supra, and to support the jury verdict under the principles set forth at length in Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), and Dolvin v. State, 391 So.2d 133 (Ala. 1980).
 B
As a secondary heading under this issue, Gainer asserts that the state failed to prove beyond a reasonable doubt that she did not believe she had a claim to the money in these accounts. Under Ala. Code 1975, § 13A-8-12, an honest belief in such *Page 681 
a claim is a proper defense in a theft prosecution.
Gainer testified that she honestly believed she had a claim to these funds because Mrs. Endicott "put me on her checking account and opened a checking account up for me and her." She also stated that she reviewed and discussed with Mrs. Endicott the bank statements each month and indicated that Mrs. Endicott was aware of the purchases she (Gainer) made. However, in Part A above, we concluded that the state's evidence was sufficient to afford the inferences that Mrs. Endicott's physical and mental condition were such that she was not fully competent to understand or manage her financial affairs and that Gainer knew of Mrs. Endicott's diminished mental capacity and used this knowledge to assume unauthorized control of Mrs. Endicott's financial affairs. Where evidence offered in defense conflicts with the state's evidence, the resolution of the conflict is a question for the jury. Cf. Finchum v. State, 461 So.2d 37, 39
(Ala.Cr.App. 1984) ("[s]elf defense evidence, like all otherconflicting evidence, is a matter for the jury to decide") (emphasis added); Jeffers v. State, 455 So.2d 201, 203
(Ala.Cr.App. 1984) ("[i]t is axiomatic that a conflict between the State's case and a defendant's alibi presents a jury question"); Watson v. State, 439 So.2d 762, 767 (Ala.Cr.App. 1983) ("[w]hen there is a contradiction in the evidence, the defense of entrapment should be resolved by the jury");Burleson v. State, 52 Ala. App. 399, 404, 293 So.2d 317, 322
(1974) (where defendant claimed to own furniture which he was accused of stealing, his claim "made and presented a jury question, and the jury simply rejected his claim").
 II
Gainer maintains that, as a matter of law, a joint owner of a bank account cannot be guilty of the theft of funds from that account.
As a general proposition it is true that a joint owner of property cannot be convicted of the theft of that property.Holcombe v. State, 69 Ala. 218, 219 (1881) ("[a]t common law, a joint owner, or tenant in common of personal property can not be guilty of a larceny, by taking or appropriating to his own use the whole or any part of the joint property, however fraudulent or felonious in fact may be his intent, unless he take it from the custody of a bailee, with intent to charge the latter with pecuniary liability"); Kirksey v. Fike, 29 Ala. 206,209 (1856) (same). See also C. Torcia, 3 Wharton'sCriminal Law § 393, p. 391 (14th ed. 1978); Annot. 17 A.L.R.3d 1395 (1968). However, this principle does not apply in such a case as that presented here where the facts indicate that the defendant wrongfully obtained her status as a joint owner. For this reason, Gainer's reliance on Hinkle v. State,355 So.2d 465 (Fla.Dist.Ct.App.), cert. dismissed, 359 So.2d 1220 (Fla. 1978), is misplaced.
In Hinkle, two certificates of deposit were established in the names of the victim and the defendant, who were romantically involved. The funds in these accounts were contributed solely by the victim. The defendant made nine withdrawals from these accounts. After "an apparent falling out" of the parties, the victim alleged that the defendant improperly withdrew this money. She claimed that she had intended the accounts to be distributed to her children after her death and that she had informed the defendant of this intent prior to the withdrawals by him. The applicable bank documents, however, provided that the accounts were joint with right of survivorship and any deposits made by one party were presumed to be a pro-rata gift to the other party. The Florida Court of Appeals reversed and rendered the defendant's conviction for the theft of the money withdrawn from the certificates on the basis that "a co-owner of property cannot be held guilty of larceny of said property." 355 So.2d at 467. We note that the Montana Supreme Court also reached this conclusion in State v. Haack, 220 Mont. 141, 713 P.2d 1001
(1986), another case involving alleged unauthorized withdrawals from a joint bank account.
Neither of those cases involved a question of whether the defendant had wrongfully *Page 682 obtained his status as a joint account holder. Nor did those cases involve evidence indicating that the victim was mentally deficient and unable to effectively consent to theestablishment of the joint account. Instead, both cases involved claims that the defendants, once properly authorized to sign on the accounts, thereafter exerted unauthorized control over the accounts by withdrawing the funds in the account in an unauthorized manner or for unauthorized expenditures. Thus, we find those cases distinguishable on their facts.
Furthermore, those cases indicate that the applicable bank documents are the controlling factor in cases concerning joint bank accounts.[3] With this we cannot agree, although we do recognize that such a holding has value in preventing the misuse of criminal prosecutions in certain situations, such as escalated family quarrels. Such a broad holding, however, also permits a defendant to obtain control over an account by taking advantage of one who is mentally deficient (or by any other nefarious means not specifically included in the definition of "deception" found in Ala. Code 1975 § 13A-8-1(1) [4]), and then escape criminal liability on the basis of documents which were drafted primarily to protect the depositary bank.[5]
Accordingly, we hold that in a criminal prosecution for theft, where the evidence supports an inference that the defendant wrongfully obtained control over a bank account, the question of whether the defendant is actually a joint owner of the account is a question for the jury. In such a situation, a defendant should not be shielded from criminal prosecution simply by virtue of the terms of a signature card. Without belaboring the facts already stated, we find that the evidence concerning the sources of the funds in the accounts and Mrs. Endicott's physical and mental condition was sufficient to create a jury question as to whether Gainer was actually a joint owner of these accounts. Cf. Burleson v. State, supra (where defendant *Page 683 
claimed to own furniture which he was accused of stealing, his claim "made and presented a jury question").
 III
The prosecutor's cross examination of Gainer with regard to her failure to respond to a civil deposition subpoena was not an impermissible reference to her post-arrest, post-Miranda silence and therefore did not violate her Fifth Amendment rights. The prosecution may not "use evidence of defendant's post-arrest, post-Miranda warning silence for substantive purposes or as evidence of defendant's guilt."Houston v. State, 354 So.2d 825, 827 (Ala.Cr.App. 1977), cert. denied, 354 So.2d 829 (Ala. 1978) (emphasis added). Nor may the prosecution use such silence for impeachment purposes. Doyle v.Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). "However, the adverse use of a defendant's pre-arrest silence,Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124,65 L.Ed.2d 86 (1980), or his silence in the absence of Miranda warnings,Fletcher v. Weir, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490
(1982), does not offend the constitutional principles of the Fifth Amendment." Salster v. State, 487 So.2d 1020, 1021
(Ala.Cr.App. 1986) (emphasis added).
On cross examination, the prosecutor elicited from Gainer the fact that she left town about a week before Mrs. Endicott's death on July 9, 1987. Gainer stated that she went to Virginia at this time because "I was terrified of my ex-husband," The prosecutor then elicited from Gainer the information that she had been served with a deposition subpoena issued with regard to civil proceedings concerning Mrs. Endicott, but that she did not attend the deposition. The prosecutor also elicited this information from the state's rebuttal witness, Mr. Paul Hiebel, a trust officer at First Alabama Bank.[6] It does not appear from the record that Gainer had been arrested and informed of herMiranda rights at the time she failed to appear in response to this subpoena, nor does she make any assertion to that effect in her brief. Gainer's failure to attend the deposition can only be considered a pre-arrest silence, and, under the authorities cited above, evidence of it was clearly admissible.
Moreover, the prosecutor indicated at trial that he was offering this evidence to show Gainer's "flight at the close of these proceedings and her unwillingness to discuss it [the disposal of the funds in question] with civil representatives of Mrs. Endicott." It is well settled that "[e]vidence of the flight of the accused is admissible to show his consciousness of guilt." Prock v. State, 471 So.2d 519, 521 (Ala.Cr.App. 1985); Ex parte Jones, 541 So.2d 1052 (Ala. 1989). This is true "even where the conduct of the defendant tending to show flight is weak and inconclusive." Bighames v. State, 440 So.2d 1231,1234 (Ala.Cr.App. 1983). Just as a defendant's pre-arrest silence to the police is admissible, Jenkins v. Anderson, supra, a defendant's pre-arrest "failure to give statements to private parties, such as security guards," or, as in this case, the personal representatives of the victim, is also admissible,People v. Heidorn, 114 Ill. App.3d 933, 70 Ill.Dec. 439, 445,449 N.E.2d 568, 574 (1983).
 IV
There was no error in the trial court's refusal to permit Gainer to question certain defense witnesses as to the feelings which existed between Gainer and Mrs. Endicott.
Gainer's defense was that Mrs. Endicott gave her the funds which were the subject of the alleged theft. During her testimony, Gainer characterized her relationship with Mrs. Endicott as "mother-daughter" and described how this relationship developed while Mrs. Endicott was in Tyson Manor. Gainer asserted that she loved Mrs. Endicott and visited her "every day *Page 684 
after work and then on weekends" after Mrs. Endicott was discharged from the nursing home.
Four defense witnesses were thereafter asked to describe the feelings which existed between Gainer and Mrs. Endicott. The trial court sustained the prosecutor's objection to this question with regard to three of these witnesses, which included two of Gainer's friends of long standing and Gainer's daughter. The prosecutor did not object to the question when posed to the fourth witness, Dr. Robert O'Brien, the physician attending Mrs. Endicott from April 25, 1987, until her death that July. Dr. O'Brien described the relationship between Gainer and Mrs. Endicott as loving and devoted. He stated that he had initially assumed "that Mrs. Gainer was Mrs. Endicott's daughter because of the way they acted toward each other."
Gainer contends that it was critical to her defense to "be allowed to show the feelings and general relationship between [herself and Mrs. Endicott] and, in particular, to show the feelings that they had for each other." Appellant's brief at 28. However, "[i]t is generally recognized that the mental state of another is a matter of opinion rather than fact. A witness therefore is precluded under the opinion rule from testifying that another did or did not know a certain fact or feel a certain way." C. Gamble, McElroy's Alabama Evidence § 128.08 (3d ed. 1977).
We are aware that there are several cases wherein the trial court was deemed to have erred in failing to permit a witness to testify as to the feelings existing between the defendant and another person. Bennefield v. State, 134 Ala. 157,32 So. 717 (1901); Lodge v. State, 122 Ala. 97, 26 So. 210 (1898);Wallis v. State, 51 Ala. App. 499, 286 So.2d 909, cert. denied,291 Ala. 801, 286 So.2d 912 (1973); Peinhardt v. State,37 Ala. App. 693, 76 So.2d 176, cert. denied, 262 Ala. 10,76 So.2d 179 (1954). However, a close reading indicates that this evidence was offered in Bennefield, Lodge, and Peinhardt to show bias toward the defendant on the part of the witness, and in Wallis to show such bias on the part of the victim. Each of these cases appears to involve ill will or dissension between the defendant and the third party. Where, as here, testimony regarding the feelings of another is offered for substantive purposes rather than to show bias towards the defendant, the general rule stated above should prevail.
Moreover, Gainer described the relationship between herself and Mrs. Endicott in her testimony and Dr. O'Brien later did likewise. Thus, the testimony of the other three witnesses as to this relationship would have been cumulative. The admission or exclusion of cumulative evidence rests within the sound discretion of the trial judge. Allen v. State, 290 Ala. 339,343, 276 So.2d 583, 586 (1973). This is true even where the cumulative evidence which is excluded is relative to the defense being presented. United States v. Gregory,730 F.2d 692, 705 (11th Cir. 1984), cert. denied, 469 U.S. 1208,105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). We find no abuse of discretion in this case.
 V
Gainer asserts that the trial court erred in allowing the state to (1) show that she failed to comply with a civil deposition subpoena and (2) pose the following question to her daughter on cross examination: "Do you remember telling your dad, William Edwin Cockrell, that you had seen your mother putting something in Mrs. Endicott's drink?" She maintains that these actions on the part of the state resulted in the admission of evidence of collateral criminal activity not charged in the indictment.
It is axiomatic that, in general, evidence of the accused's commission of crimes not charged in the indictment are inadmissible at his trial for a specific offense. C. Gamble,McElroy's Alabama Evidence § 69.01(1) (3d ed. 1977), and cases cited therein. Gainer's failure to appear for her deposition, however, is clearly not criminal activity, see Rule 37(b), A.R.Civ.P., and does not fall within this exclusionary rule. It is questionable whether the question propounded to Gainer's daughter *Page 685 
amounts to evidence of collateral crimes. Even assuming that it does, it falls within the continuous transaction exception to the exclusionary rule. "No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which defendant is charged." Coleman v. State,487 So.2d 1380, 1385 (Ala.Cr.App. 1986) and cases cited therein. Seegenerally, McElroy's § 69.01(3).
The state's evidence covered a substantial period of time during which Gainer was alleged to have stolen from the victim some $111,000. Under the peculiar facts of this case, the theft of the victim's funds can be viewed as "one continuous criminal occurrence" which took place over an extended time period. During this time Gainer had the victim's telephone number and door locks changed. There was testimony that Gainer "fixed up" the victim's medicine and that the victim was given Nyquil, which probably served to sedate her. Gainer has not challenged the admission of these facts. In this case, the events and circumstances relating to Gainer's activities with regard to Mrs. Endicott were "inseparably intertwined with," Dutton v.State, 434 So.2d 853, 855 (Ala.Cr.App. 1983), and assisted in establishing the "entire context out of which the [theft] arose," Smith v. State, 365 So.2d 704, 707 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). Thus, even if the question to Gainer's daughter indicated other criminal activity by Gainer, it was permissible inasmuch as it related to these same circumstances.
For the reasons stated above, the judgment of the Montgomery Circuit Court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] There has been no allegation by the state that her signature on any of the documents involved was forged.
[2] It does not appear from the record, nor has Gainer made any claim, that she was appointed guardian or curator for Mrs. Endicott pursuant to Ala. Code 1975, § 26-2A-100 et seq., or §26-7A-1 et seq.
[3] The bank documents in Hinkle provided that the accounts were joint with right of survivorship and that the parties agreed "that any funds placed in or added to the account by any one of the parties are and shall be conclusively intended to be a gift at that time of such funds to the other signatory party or parties to the extent of his or their pro-rata interest in the account." 355 So.2d at 466. The victim maintained that she did not intend the defendant to make any withdrawals from these accounts during her lifetime, these accounts being for testamentary distribution to her children, and that she had informed the defendant of her intent. In reversing and rendering the defendant's theft conviction, the Florida Court of Appeals stated:
 "The state contends that the defendant was never a co-owner in the joint bank certificates because [the victim] never intended to make a gift of the money therein to the defendant. This is conclusively refuted by the written agreement which she signed with the defendant making the defendant a joint tenant in the savings certificates." Id. at 467 (emphasis added).
In Haack, the defendant, a contractor, was engaged by the husband and wife victims to construct a house for them. A joint checking account was opened in the names of the defendant and the husband. The victims deposited $30,000 to be used in building the house. Thereafter, the defendant withdrew over $10,000 for "personal unauthorized purposes."713 P.2d at 1001-02. The trial court found, as a matter of law, that the defendant, as a joint tenant in the account could not be convicted of theft. The Supreme Court of Montana affirmed this finding, even though the dissent noted that a separate contract existed between the parties and would have permitted the state "to prove, if it is able, that the defendant, by the terms of his contract, was not authorized to exercise control over the joint tenancy funds in the manner which he did." Id. at 1003.
[4] It is clear that acts by the defendant amounting to deception can vitiate the terms of the bank documents. See Ala. Code 1975, § 13A-8-2(2). This can occur even where the victim initially effectively consented to the defendant's inclusion as a joint account holder. See State v. Adair, 215 Kan. 54, 523 P.2d 360
(1974).
[5] This court is well aware of the confusion surrounding the ownership of joint bank accounts upon the death of one of the account holders where the bank documents do not specifically provide for right of survivorship. See e.g., Briscoe v. Latta,471 So.2d 405 (Ala. 1985); Ex parte Lovett, 450 So.2d 116 (Ala. 1984); Ala. Code 1975 § 5-5A-41. We are not attempting to deal with that issue in this case. However, we do note that even where the bank documents provide for joint ownership with right of survivorship, the survivor's ownership of the account can be negated by claims of undue influence or incompetency. SeeMcCollough v. Rogers, 431 So.2d 1246 (Ala. 1983), and cases cited therein.
[6] In April 1987, Mr. Hiebel was approached by one of Mrs. Endicott's distant relatives with regard to setting up a trust for Mrs. Endicott. In June 1987, First Alabama Bank was "named curator for Mrs. Endicott." After Mrs. Endicott's death, the bank was appointed co-executor of her estate.