(79 P.3d 202)

No. 87,696

No. 87,697

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER MAXON, *Appellant*.

STATE OF KANSAS, *Appellee*, v. JODI MAXON, *Appellant*.

 Opinion
filed November 21, 2003. 

*Allan E. Coon*, of Norton, Hubbard, Ruzicka & Kreamer L.C., of Olathe, and *Scott C. Gyllenborg*, of Scott C. Gyllenborg, P.A., of Olathe, for appellants.

*Stephen M. Howe* and *Steven J. Obermeier*, assistant district attorneys, *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before JOHNSON, P.J., GREENE, J., and DAVID W. KENNEDY, District Judge, assigned.

JOHNSON, J.: Christopher and Jodi Maxon were each convicted of two counts of theft and one count of mistreatment of a dependent adult. They appeal, challenging the sufficiency of the evidence and the imposition of Christopher's upward dispositional departure sentence. We affirm the mistreatment of a dependent adult convictions but reverse the theft convictions, thereby rendering the sentencing question moot.

The scenario presented is one in which the defendants took unfair advantage of the vulnerability of an elderly, recently-widowed woman for the defendants' personal and financial gain. The difficult legal questions presented emanate from the State's charging the defendants with felony thefts for conduct that appears to fit squarely within the definition of misdemeanor mistreatment of a dependent adult.

The victim, Bea Bergman, lost her husband, Paul, to a heart attack in January 1999. Bea and Paul had lived modestly and accumulated substantial assets valued in the millions of dollars. Bea had relied on Paul to handle all their major financial decisions and, at his death, was even relying exclusively on him for transportation. After Paul's death, Bea was "[v]ery confused and very lost"; she experienced several episodes of anxiety for which she summoned emergency medical assistance. The month following Paul's death, Dr. Yvette Crabtree of the Kenyon Clinic examined Bea and prescribed an anti-anxiety medication and an antidepressant.

Also in the month following Paul's death, Bea called Maxon Moving to arrange for the hauling of Paul's personal effects to the Salvation Army. Maxon Moving was a family-owned operation and had been one of Paul's regular customers since the 1940s. Further,

Paul and Bea had hired Maxon Moving to move their belongings on a number of occasions. Bea talked with Joyce Maxon and mentioned that she intended to give her husband, Ron Maxon, Sr., a marble-top table that Ron Sr. had admired during previous moves. The next day Ron Sr. went to Bea's house. Bea gave him the table, as well as a thank you card containing a $2,000 check.

Shortly thereafter, Joyce became a frequent visitor at Bea's house. She would transport Bea to antique shops, to the grocery store, to the doctor's office, and to church. Eventually, Joyce was spending weekday nights at Bea's house, and Bea would spend the weekend at Joyce's house. Bea became progressively integrated into the Maxon family, which, in addition to Ron Sr. and Joyce, included Ron Maxon, Jr., Christopher Maxon, Jodi Maxon, and Sharyl Ledom. Bea attended Maxon family functions and wanted the Maxons to call her "Aunt Bea." Coincidentally, as Bea was being welcomed into the Maxon family circle, she began writing checks to and purchasing property for the various Maxon family members. During the approximately 8-month long feeding frenzy, Bea dispersed over $600,000 to or for the benefit of the Maxons. However, during this same period, Bea also wrote checks to her daughter, her granddaughter, and a niece.

Specifically, the theft charges in this case involved: (1) the sale of Bea's house to Christopher and Jodi; and (2) Christopher's purchase of a new truck. In May 1999, Bea had listed her house for sale with her real estate agents, Linda and Charles Stanfield; the listing price was $177,500. Shortly after the listing, Bea moved into an apartment. The listing was cancelled in June 1999, and Christopher and Jodi moved into the house. In July, the new occupants fenced the yard, installed a hot tub, and built a new deck, albeit Bea footed the bill. In late July or early August, Christopher and Jodi contracted with Bea to purchase the house for $100,000, financed in part with a $99,500 promissory note which was to balloon upon the Maxons' sale of their La Cygne, Kansas, house. The note was paid in full within 3 or 4 months. There was some testimony that Bea had offered to give the house to Christopher and Jodi.

In October 1999, Christopher picked out a new Ford truck at a dealership in Olathe. He asked the salesman for permission to drive

the truck to show his mother, because if she approved of the vehicle, she would give him the purchase money. Christopher drove to Bea's apartment, gave her a ride, and presented her with the bill. Bea wrote a $38,745.34 check, payable to Olathe Ford, and gave it to Christopher to purchase the truck. Bea was not sure, but she thought Jodi accompanied Christopher when this transpired. The truck was titled solely in Christopher's name.

In November 1999, Bea reconciled with her estranged son, Paul Thorpe. Thorpe and his wife subsequently moved into an apartment down the hall from Bea.

During the Christmas season of 1999, Bea severed her relationship with the Maxons. The rift was precipitated by the Maxons' Christmas gifts to Bea, which she considered to be miserly responses to her Christmas gifts to them of $25,000 checks. She was hurt by the Maxons' failure to reciprocate her generosity and had no further contact with the Maxons.

Subsequently, Bea's son examined her financial records and noted the checks that had been written to the Maxons. Bea and her son met with the attorney that was acting as Paul's executor, who referred them to another attorney, Harry Wigner. Wigner sent Bea to a psychiatrist for an examination and contacted the district attorney's office about the possibility of filing criminal charges.

The psychiatrist, Dr. Everette Sitzman, diagnosed Bea as suffering from bipolar disorder with episodes of hypomania and prescribed a mood stabilizing agent. The doctor opined that people with Bea's affliction are vulnerable to influence by others and often require a protective trust or conservatorship to protect their assets.

After a year-long investigation, the Johnson County District Attorney's office filed charges against Ron Sr., Joyce Maxon, Jodi Maxon, Christopher Maxon, Sharyl Ledom, and Ron Maxon, Jr. All of the defendants, except for Ron Jr., were tried together. The case before us involves the charges against Christopher and Jodi which were identical: (1) one count of felony theft of Bea's house; (2) one count of felony theft of United States currency (used to purchase the Ford truck); and (3) one count of misdemeanor mistreatment of a dependent adult. The thefts were charged in the alternative, alleging that they were committed by obtaining or ex-

erting unauthorized control over the property or that they were committed by obtaining the property through deception. Further, the jury was given an aiding and abetting instruction. Christopher and Jodi were convicted on all counts; the jury found the thefts were committed in both alternative manners. The district court granted the State's motion for an upward dispositional departure sentence in Christopher's case based on Bea's vulnerability and sent him to prison for 38 months. Jodi received a presumptive probation sentence.

Appellants structure their appeal to first challenge the sufficiency of the evidence to support a conviction based upon K.S.A. 2002 Supp. 21-3701(a)(1), arguing they did not obtain or exert unauthorized control over any of Bea's property, *i.e.* no theft occurred. As a sub-issue, appellants assert that they could not have aided or abetted a theft that did not occur. Next, the Maxons argue the absence of any evidence to establish that any false statements or representations were made to induce Bea to transfer her property, negating the sufficiency of the evidence to support the theft by deception convictions under K.S.A. 2002 Supp. 21-3701(a)(2). Again, as a sub-issue, appellants assert that the aiding or abetting instruction could only have been applicable to Jodi, if at all, but that no evidence exists that she advised, counseled, procured, or encouraged Christopher to commit a crime. The third issue presented challenges the sufficiency of the evidence to support the convictions for mistreatment of a dependent adult, asserting that Bea was not a "dependent adult" in 1999 and that appellants did not mistreat her. Included in the third issue is a multiple acts argument. Finally, appellants challenge the constitutionality of Christopher's upward dispositional departure sentence, as well as the existence of substantial and competent evidence of a substantial and compelling reason to depart. We will take the liberty of addressing the issues in a different order than that presented.

### MISTREATMENT OF DEPENDENT ADULT

In deciding appellants' challenge to the sufficiency of the evidence to support their convictions for mistreatment of a dependent adult, we review all of the evidence, viewed in the light most fa-

vorable to the prosecution, to determine if a rational jury could have found the defendants guilty beyond a reasonable doubt. See *State v. Zabrinas*, 271 Kan. 422, 441-42, 24 P.3d 77 (2001). We are to refrain from the temptation to weigh the evidence or pass on the credibility of the witnesses. *State v. Sanders*, 272 Kan. 445, 455, 33 P.3d 596 (2001).

The statute creating this crime is K.S.A. 21-3437, the relevant portions of which are:

"(a) Mistreatment of a dependent adult is knowingly and intentionally committing one or more of the following acts:

. . . .

(2) taking unfair advantage of a dependent adult's physical or financial resources for another individual's personal or financial advantage by the use of undue influence, coercion, harassment, duress, deception, false representation or false pretense by a caretaker or another person . . . .

. . . .

"(c) For purposes of this section: 'Dependent adult' means an individual 18 years of age or older who is unable to protect their own interest ."

The elements instruction given in these cases informed the jury that it had to find, *inter alia,* that the defendants "knowingly and intentionally took unfair advantage of Bea Bergman's financial resources for another individual's financial advantage by the use of undue influence, coercion, deception, false representation, or false pretense" and that Bea Bergman was a "dependent adult." The elements instruction provided the statutory definition of dependent adult; a separate instruction provided definitions of undue influence, coercion, deception, and false pretense.

Christopher and Jodi present two arguments: (1) The evidence does not establish that Bea was a dependent adult; and (2) no evidence was presented to establish undue influence, coercion, deception, or false pretense. To the extent appellants' arguments require statutory interpretation, our review is de novo. See *Thomas v. Hannigan*, 27 Kan. App. 2d 614, 616, 6 P.3d 933 (2000).

*Was the Victim a Dependent Adult?*

Following the definition of dependent adult, K.S.A. 21-3437(c) provides a list of factual circumstances which are included within the definition, *e.g.,* any resident of an adult care home. None of

the illustrations is applicable here. Appellants argue the evidence did not establish that Bea was dependent upon Christopher and Jodi or that she was unable to handle her own financial affairs.

The State did not have to prove that Christopher and Jodi were the persons on whom Bea was dependent. The statute specifically prohibits the taking of unfair advantage of a dependent adult "by a caretaker or *another person.*" (Emphasis added.) K.S.A. 21-3437(a)(2). Persons other than a caretaker can mistreat a dependent adult, if the victim is unable to protect herself or himself.

In arguing the insufficiency of the evidence to establish Bea's inability to protect her own interest, appellants acknowledge that Dr. Sitzman provided direct testimony on that question. However, appellants urge us to discount Dr. Sitzman's testimony and look to the other evidence supporting their contention that Bea was a confident, assertive individual. Our standard of review precludes our making an assessment of Dr. Sitzman's credibility or weighing his testimony against that of the other medical professionals, no matter how qualified or persuasive the others might appear on the record. The jury viewed the witnesses firsthand and its factual determination must be respected.

### Evidence of Mistreatment

Appellants persuasively argue that the evidence did not support a finding that they utilized coercion, deception, false representation, or false pretense to obtain money and property from Bea. However, the statute is drawn in the disjunctive; evidence of undue influence is sufficient to support a conviction.

Christopher and Jodi point to his mother, Joyce, as the source of influence over Bea and contend that "appellants cannot be held responsible for any influence which may have been exercised by persons other than themselves." Appellants omit any discussion of the aiding and abetting jury instruction.

The evidence was sufficient to establish that the Maxon family systematically preyed upon Bea's mental and emotional vulnerability to obtain her money. Joyce orchestrated the transfers, timing the gift requests to coincide with Bea's manic or "giving" periods and deciding who would be the next recipient of Bea's bounty.

However, all family members, including Christopher and Jodi, participated in the scheme. Indeed, the siblings apparently squabbled about who should get the next distribution and the inequities in the amounts each was receiving.

The legislature, by enacting K.S.A. 21-3437, intended to criminalize the conduct in which Christopher and Jodi engaged in conjunction with other Maxon family members. The evidence was sufficient to support the convictions for mistreatment of a dependent adult.

*Multiple Acts*

Appellants complain that the evidence depicted several acts which could each constitute the crime of mistreatment of a dependent adult and, therefore, they were deprived of their right to a unanimous verdict because the verdict forms did not require the jury to specify an underlying act. The State alleged that Bea had given checks and property to Christopher and Jodi with a value in excess of $200,000, including several items other than the house sale and Ford truck purchase which were the subjects of the theft charges. The State was relying on these other transfers to support the mistreatment of a dependent adult charge.

Appellants acknowledge that the jury was given two unanimity instructions; one for Christopher and one for Jodi. Those instructions specifically told the jury that "[i]n order for the defendant to be found guilty of . . . mistreatment of a dependent adult in Count III, you must unanimously agree upon the same underlying act."

In a multiple acts case, the jury must be unanimous as to which act or incident constitutes the crime. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). The State may either elect the particular act upon which it is relying or the court must provide a unanimity instruction. See *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994). Here, the State opted for a unanimity instruction. Appellants got what they were entitled to have, and there was no error.

## THEFT BY DECEPTION

Appellants' challenge to the sufficiency of the evidence to support their theft convictions under the K.S.A. 2002 Supp. 21-3701(a)(2), theft by deception, alternative is subject to the same standard of review as cited above. *State v. Fritz*, 261 Kan. 294, 299, 933 P.2d 126 (1997), summarized the elements of theft by deception:

"To establish the offense of theft by deception, the State must prove: (1) The victim was the owner of the property, (2) the defendant obtained control over the property by means of a false statement or representation which deceived the property owner and upon which he or she relied, and (3) the defendant intended to deprive the owner permanently of the use or benefit of the property."

Appellants note that the record contains no evidence that they made an express or implied false statement or representation in conjunction with the house sale or the truck purchase. Further, they argue that Bea did not rely on any false statements or representations that may have been made. We agree.

The State's brief emphasizes the circumstances surrounding the two transactions but fails to identify any falsity upon which Bea relied. The representations which might have induced Bea's actions are either true or not shown to be false. As examples: Christopher's statement that he needed a new truck because the transmission was out of his existing truck is not refuted in the record; the representation that Christopher and Jodi were having difficulty selling their La Cygne house is supported in the record.

The only arguably false statement referred to by the State involved comments that certain Maxon family members had seen or heard from Bea's dead husband. While such statements may have been calculated to endear the Maxons to Bea or to further the general exploitation of the vulnerable widow, any inference of a causal connection between the statements and the specific transactions being prosecuted is too nebulous to support a criminal conviction.

The evidence was insufficient to support the convictions for theft by deception, and those convictions are reversed.

## THEFT BY OBTAINING OR EXERTING UNAUTHORIZED CONTROL

Alternatively, Christopher and Jodi were alleged to have committed theft by the more commonly understood means of simply taking Bea's property without her permission. In statutory parlance, they were charged with "[o]btaining or exerting unauthorized control over property." K.S.A. 2002 Supp. 21-3701(a)(1). The elements instruction identified the stolen property as: (1) the house and property at 11412 Flint, Overland Park, Johnson County, Kansas; and (2) United States currency in connection with the purchase of the Ford F-350 pickup.

The appellants point us to the obvious problem with defining their acts as a traditional theft, *i.e.* they obtained control over the property with Bea's permission. Bea not only authorized Christopher and Jodi to take control of the property, but she actively participated in effecting the transfers. Bea signed and acknowledged the execution of the warranty deed to transfer the residential real estate; Bea wrote the check, payable to Olathe Ford, and gave it to Christopher.

In *State v. Greene*, 5 Kan. App. 2d 698, 702, 623 P.2d 933 (1981), this court examined the phrase "obtaining or exerting unauthorized control" in connection with the criminal deprivation of property statute, K.S.A. 2002 Supp. 21-3705. The court noted that the term "unauthorized" is not defined by the Kansas Statutes and then adopted the following definition: " ' "Unauthorized control means control exercised over property of another without the consent of the owner." ' " 5 Kan. App. 2d at 703 (quoting Wilson, *Thou Shalt Not Steal: Ruminations on the New Kansas Theft Law*, 20 Kan. L. Rev. 385, 395 [1972]).

Based on that definition, the theft convictions cannot stand if Bea consented to the property transfers. On appeal, the State does not contend that Bea did not consent to the defendants' control over the property, but rather the argument is that Bea's consent was ineffective because she did not possess the necessary mental capacity to give her property to the defendants.

The State acknowledges the absence of any Kansas case addressing whether a donee can be convicted of theft for accepting a gift

from a mentally impaired donor. We are directed to decisions from other states to persuade us that such a prosecution should be permitted in this state. See *Gainer v. State*, 553 So. 2d 673, 679-80 (Ala. Crim. App. 1989); *State v. Calonico*, 256 Conn. 135, 155-56, 770 A.2d 454 (2001); *Deranger v. State*, 652 So. 2d 400, 401 (Fla. Dist. App. 1995); *Lucas v. State*, 183 Ga. App. 637, 641, 360 S.E.2d 12 (1987); *People v. Camiola*, 225 App. Div. 2d 380, 381, 639 N.Y.S.2d 35 (1996).

The State relies heavily on *Gainer*, in which the Alabama Court of Criminal Appeals noted that several other states had adopted specific "statutory provisions vitiating consent obtained from one whom the defendant knows or should know lacks the mental capacity to voluntarily and intelligently give such consent." 553 So. 2d at 679. The court further commented:

> "There is no such provision in Alabama law with regard to offenses involving theft. . . . However, we are of the opinion that, even without an express statutory provision to that effect, mental deficiency on the part of the victim, which is known or should be known to the defendant, can render ineffective the apparent consent by that victim in a prosecution for theft [by knowingly obtaining or exerting unauthorized control over the property of another]." 553 So. 2d at 679.

Like Alabama, our statutes do not contain a specific provision that negates an individual's consent when the defendant knows or should know the donor lacks the mental capacity to give consent. See Colo. Rev. Stat. § 18-1-505(3)(b) (2003) (assent does not constitute consent if "given by a person who, by reason of immaturity, mental disease or mental defect, or intoxication, is manifestly unable and is known or reasonably should be known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense"); Tex. Penal Code Ann. § 31.01(3)(C) (2003) (consent is not effective if "given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable property dispositions"). On appeal, the State urges us to judicially create a definition of "unauthorized control" that includes a consensual transfer from a donor who has insufficient mental capacity to give a voluntary or intelligent consent.

The initial dilemma presented by the State's argument is determining the legal standard that should be applied to determine the level of incapacity that would vitiate the transferor's consent. Without some standard, a donee would not have a sufficiently adequate warning that his or her acceptance of a gift is a theft and the law would not adequately guard against arbitrary and discriminatory enforcement. See *State v. Bryan*, 259 Kan. 143, Syl. ¶ 2, 910 P.2d 212 (1996). Does a transferor have to possess the capacity to contract? See *Mills v. Shepherd*, 159 Kan. 668, Syl. ¶ 1, 157 P.2d 533 (1945) ("The test of mental capacity to contract or to convey property is whether the person possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged."). Would the State have met its burden of proving an unauthorized transfer by proving Bea fit the definition of a "disabled person" under the involuntary conservatorship statutes in effect at the time of transfer? K.S.A. 59-3002 (" 'Disabled person' means any adult person whose ability to receive and evaluate information effectively or to communicate decisions, or both, is impaired to such an extent that the person lacks the capacity to manage such person's financial resources or, except for reason of indigency, to meet essential requirements for such person's physical health or safety, or both."). Alternatively, we could be guided by the current act for obtaining a guardian or conservator, K.S.A. 2002 Supp. 59-3050 *et seq.*, which refers to an " 'adult with an impairment in need of a guardian or a conservator, or both' " and defines such a person to be one

"whose ability to receive and evaluate relevant information, or to effectively communicate decisions, or both, even with the use of assistive technologies or other supports, is impaired such that the person lacks the capacity to manage such person's estate, or to meet essential needs for physical health, safety or welfare, and who is in need of a guardian or a conservator, or both." K.S.A. 2002 Supp. 59-3051(a).

Or, do we look at the rather minimal capacity needed to make a testamentary disposition? See *In re Estate of Walter*, 167 Kan. 627, Syl. ¶ 3, 208 P.2d 262 (1949) ("to prove testatrix did not have testamentary capacity it must be established either that she did not know the amount of her property; that she did not know to whom

she wished her property to go, or that she did not understand who were the natural objects of her bounty").

The jury was not instructed on the State's unique theory. Closing arguments do not appear in the record so that we do not know how the State's theory of unauthorized control was presented to the jury. On appeal, the State suggests that a theft conviction is appropriate "if a victim is incapable of giving a voluntary or intelligent consent to transfer money."

"All crimes in Kansas are statutory, and the elements necessary to constitute a crime must be gathered wholly from the statute." *State v. Christiansen*, 258 Kan. 465, 466, 904 P.2d 968 (1995). In gathering the requisite elements of a crime from a statute, we are not imbued with unlimited creativity.

"The fundamental rule of statutory construction is that a court should interpret a statute to give it the effect intended by the legislature. [Citation omitted.] In Kansas, all crimes are established by statute, and a court should not extend a criminal statute to embrace acts or conduct not clearly included within the statutory prohibitions. [Citations omitted.]" *State v. Arehart*, 19 Kan. App. 2d 879, 881, 878 P.2d 227 (1994).

The argument that the legislature intended felony theft, committed by obtaining or exerting unauthorized control over property, to be extended to embrace the act of obtaining a consensual transfer from a person with mental, emotional, or personality problems would be more persuasive if the legislature had not created the specific crime of mistreatment of a dependent adult to encompass that act. The State recognized that the mistreatment of a dependent adult crime applied to this scenario by prosecuting the Maxons for that crime for all of Bea's transfers, except for the two selected to be charged as felony thefts. Precedent teaches us that it is improper to prosecute a defendant for a general crime when the facts establish the violation of a specific statute. See, *e.g., Carmichael v. State*, 255 Kan. 10, Syl. ¶ 5, 872 P.2d 240 (1994) (specific offense of aggravated incest must be charged instead of general crime of rape); *State v. Wilcox*, 245 Kan. 76, 79, 775 P.2d 177 (1989) (welfare fraud must be prosecuted under the specific statute, K.S.A. 39-720, and not the general statute of making a false writing). " ' "A statute which relates to persons or things as a class is a

general law, while a statute which relates to particular persons or things of a class is special." ' *Seltmann v. Board of County Commissioners*, 212 Kan. 805, 810, 512 P.2d 334 (1973) (quoting 82 C.J.S., Statutes § 163, p. 277)." *State v. Montgomery*, 14 Kan. App. 2d 577, 580, 796 P.2d 559 (1990). Obviously, the theft statute is general while the mistreatment of a dependent adult statute is specific. Therefore, we decline to find that the legislature intended to make those acts constituting the specific crime of mistreating a dependent adult part of the general theft statute definition of obtaining or exerting unauthorized control.

Even if we were to redefine the theft statute, we would require that the victim's impairment be more than the poor business judgment exhibited by those suffering from mild hypomania. The evidence presented does not support a finding that Bea lacked the capacity to contract, lacked testamentary capacity, or was amenable to an involuntary conservatorship as a disabled or impaired person. At best, there was substantial competent evidence that Bea suffered from emotional, mental, or personality disorders that made her vulnerable to the Maxons' influence.

During the time frame of the alleged thefts, Bea was conducting her own business and apparently entering into contracts, *e.g.*, she executed a listing agreement on her house and leased an apartment. She made gifts to her daughter of approximately $177,000 in 1999, as well as making substantial gifts to a granddaughter, a niece, and her son. None of these recipients were named as codefendants with the Maxons. Logically, if Bea had sufficient mental capacity to make gifts to her family, then she could consent to the transfers to the Maxons.

We are particularly concerned with the evidence to support the convictions for felony theft of the residential property. One of the State's own exhibits is the house deed, containing an acknowledgment which recites that Bea executed the document in the presence of the notary public and that the deed "was executed as a free and voluntary act and deed for the uses and purposes therein set forth." Further, the Maxons bought the property; they paid Bea $100,000. The elements instruction told the jury that it had to find that the Maxons obtained or exerted unauthorized control over the

entire property. At most, the Maxons cheated Bea out of the difference between the sale price and the value of the property, whatever that might have been. At what point is a purchase price so inadequate that a good deal becomes a felony? The evidence was insufficient to support the charge that the Maxons exerted or obtained unauthorized control over the entire residential property, as per the jury instructions.

The mistreatment of a dependent adult convictions are affirmed; the felony theft convictions are reversed. Given our decision on the theft convictions, we need not reach Christopher's issue regarding his upward dispositional departure sentence.

Affirmed in part and reversed in part.