979 A.2d 729

**Adelaida Maria TARRAY**

v.

**STATE of Maryland.**

**No. 149, Sept. Term, 2008.**

Court of Appeals of Maryland.

Sept. 14, 2009.

596

Amy E. Brennan, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

The appellant, Adelaida Maria Tarray ("Tarray"), appeals from her convictions, in the Circuit Court for Charles County, for the offense of exploitation of a vulnerable adult, under Md.Code (1957, 2002 Repl.Vol.), § 8–801 of the Criminal Law Article,[1] and conspiracy to commit that offense. Considering

---

1. **Section 8–801. Exploitation of vulnerable adults prohibited.**

 (a) *Definitions.*—(1) In this section the following words have the meanings indicated.

 (2) "Deception" has the meaning stated in § 7–101 of this article.

 (3) "Deprive" has the meaning stated in § 7–101 of this article.

 (4) "Obtain" has the meaning stated in § 7–101 of this article.

 (5) "Property" has the meaning stated in § 7–101 of this article.

 (6) "Value" has the meaning stated in § 7–103 of this article.

 (7)(i) "Undue influence" means domination and influence amounting to force and coercion exercised by another person to such an extent that a vulnerable adult was prevented from exercising free judgment and choice.

 (ii) "Undue influence" does not include the normal influence that one member of a family has over another member of the family.

 (8) "Vulnerable adult" has the meaning stated in § 3–604 of this article.

 (b) *Prohibited.*—A person may not knowingly and willfully obtain by deception, intimidation, or undue influence the property of an individual that the person knows or reasonably should know is a vulnerable adult with intent to deprive the vulnerable adult of the vulnerable adult's property.

 (c) *Penalty.*—(1) A person convicted of a violation of this section when the value of the property is $500 or more is guilty of a felony and:

 (i) is subject to imprisonment not exceeding 15 years or a fine not exceeding $10,000 or both; and

 (ii) shall restore the property taken or its value to the owner, or, if the owner is deceased, restore the property or its value to the owner's estate.

this statute for the first time, we must determine the extent of the misconduct embraced by the Legislature in describing what constitutes the exploitation of a vulnerable adult and whether the evidence presented at trial was sufficient to sustain Tarray's convictions. Because we conclude that the evidence was sufficient to sustain the convictions, we shall affirm the judgment of the Circuit Court.

## I.

In late spring of 2005, John D. Wright ("Wright") separated from his wife. Consequently, Wright, who for the prior 25 years had suffered from a physically debilitating medical condition leaving him paralyzed from the waist down, needed someone to care for him. Indeed, Wright was neither able to dress himself, clean himself, nor get in and out of bed without assistance. As a result, he began inquiring into the services of professional caregivers.

Wright met Tarray for the first time in May 2005, when she interviewed for the position of live-in caregiver. Although

---

(2) A person convicted of a violation of this section when the value of the property is less than $500 is guilty of a misdemeanor and:

(i) is subject to imprisonment not exceeding 18 months or a fine not exceeding $500 or both; and

(ii) shall restore the property taken or its value to the owner, or, if the owner is deceased, restore the property or its value to the owner's estate.

(d) *Sentencing.*—A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence for any crime based on the act or acts establishing the violation of this section.

(e) *Disqualification.*—A conviction under this section shall disqualify the defendant from inheriting, taking, enjoying, receiving, or otherwise benefitting from the estate, insurance proceeds, or property of the vulnerable adult, whether by operation of law or pursuant to a legal document executed or entered into by the vulnerable adult before the defendant shall have been convicted under this section and shall have made full restoration of the property taken or of its value to the vulnerable adult.

(f) *Construction of section.*—This section may not be construed to impose criminal liability on a person who, at the request of the vulnerable adult, the vulnerable adult's family, or the court appointed guardian of the vulnerable adult, has made a good faith effort to assist the vulnerable adult in the management of or transfer of the vulnerable adult's property.

Wright was relatively independent, in the sense that he worked full time from home for a defense contractor, Wright indicated that he needed someone around the house to help him perform his daily activities. Also, he indicated that he needed someone with medical expertise and knowledge about how to care for someone in his physical condition. In particular, Wright stated that he needed someone who knew how to operate and maintain his catheter device. Tarray informed Wright that she was a licensed practical nurse.[2] Wright then offered Tarray the position at a salary of $350 per week, which she later accepted.

Within weeks after starting work,[3] Tarray approached Wright and demanded a pay raise from $350 to $500 per week. According to Tarray, the work was simply too difficult to perform at her current wage. Wright later testified that he granted her request, in part, because he was "no small drink of water."

Tarray communicated additional requests to Wright between June and July of 2005. First, she requested to be paid $750 per week for the same reason mentioned previously for justifying a raise, i.e., the work was too difficult. Second, she requested that Wright fire another caregiver working in the house at the time to make room for another caregiver, David Baker. By late fall, Tarray secured a third and final pay raise from Wright, increasing her earnings to $1,000 per week. At

---

**2.** Wright testified at trial that Tarray said that she was a licensed practical nurse (LPN). Appellee points out in its brief filed in this Court, at footnote 3, that "[w]hile not disclosed to the jury, as Wright suspected, Tarray is not an LPN." On appeal, Tarray moved to strike footnote 3 from the appellee's brief on the basis that its content concerning whether Tarray was a licensed practical nurse was not considered by the jury. Subsequently, the appellee filed a response to Tarray's motion indicating that the information is relevant because Wright had doubts about the authenticity of Tarray's professed occupation. Because our review is limited to the sufficiency of the evidence, and the fact that Tarray was not an LPN was not offered into evidence at the trial, we will not consider the new evidence on appeal.

**3.** The trial transcript provides little, if any, detail in terms of the specific dates of events and occurrences.

trial, when asked why he had agreed to raising Tarray's pay by so much over a relatively short period of time, Wright said, "Because ... I was between a rock and a hard place. You know, where else am I going to go[?] I had no choice."

Except for the initial payment, Wright paid Tarray by personal check with funds from his account with Bank of America. At first, he wrote each check. Subsequently, however, Wright's physical disability prevented him from performing activities any more arduous than signing his name on checks that Tarray would prepare. Thus, he signed more than 30 checks, most of which were prepared by Tarray. Over the course of her six months of employment, Tarray earned in excess of $24,000, without any tax withholdings.

In the fall of 2005, Tarray presented Wright with a business proposition. Tarray suggested that she and Wright should enter into a joint venture. Although the proposition never amounted to anything more than a series of discussions, Wright remembers talking about naming the business "Jade."

Shortly after discussing the business proposition, at Tarray's request, Wright purchased a late model Honda Ridgeline truck. Because of his physical disability, Wright could neither drive nor ride as a passenger in the truck. Notwithstanding that, Wright agreed to buy it for Tarray in the hope that she would continue working for him.

In addition to acquiring a new means of transportation, Tarray opened a Bank of America business account in the name of John D. Wright and "Jade." Wright, however, testified that he never authorized Tarray to act on his behalf, let alone open a second account with Bank of America. Even though Wright acknowledged signing a prepared check dated December 22, 2005, Tarray never alerted Wright to the fact that this particular check was being drawn from the second Bank of America account, nor was Wright aware of this account. This fact was emphasized during the prosecutor's closing argument:

> And, as time went on, you heard more is going on. You've heard about at least three accounts that are open

that Mr. Wright did not know anything about. One of those on a check that he ends up signing off on. State's 35. And, you can tell by comparing the checks that most of the checks were [sic], different account. Same bank, different account. And again, Mr. Wright says ["]I don't know anything about that account. Yeah, I did sign this check for a thousand dollars on the 22nd[.] [T]his is an account I don't know anything about.["]

Wright, likewise, was unaware that Tarray had opened two other accounts with Maryland Bank National Association (MBNA) and Citigroup, again in the name of John D. Wright and "Jade." Furthermore, the Citigroup account named Tarray as an authorized credit cardholder, and she used the account to make several cash advances.

As Tarray's "gifts" and wages increased, the quality of care that she provided Wright deteriorated. Indeed, Tarray had taken a second job, outside Wright's home, and as a result, she was gone most of the day. Wright testified that often he was left alone, to the extent that he saw Tarray only first thing in the morning and late at night before going to bed. In addition to her frequent absences, Tarray had repeated difficulty with cleaning Wright's catheter device properly. Consequently, Wright was hospitalized for urinary tract infections on three separate occasions over the six months of Tarray's employment.

By the end of 2005, Wright decided to terminate the employment of Baker and Tarray. Accordingly, Wright asked the couple to move out.[4] Two days later, he was hospitalized for the third and final time.

On January 3, 2006, Baker and Tarray visited Wright at the hospital. While there, they asked him to sign two separate documents relating to his truck and house, respectively. In the first document, Wright agreed to let Baker and Tarray

---

4. The trial judge sustained defense counsel's objection to Wright's testimony about the other circumstances surrounding Baker's and Tarray's termination.

continue to reside in his home so long as he was in the hospital. In the other document, Wright agreed to transfer ownership in his truck to Tarray after he paid off the vehicle loan.

Although he had already asked the couple to leave his home after firing them, Wright explained that he felt obliged to take care of Baker and Tarray until they were able to get back on their feet. When asked why he signed the documents, Wright said, "Because I felt obligated due to them working for me . . . I didn't want to throw them out . . . on their ears." Similarly, he stated, "Well, I am a very feeling person. That is, I care for everybody. And I always try to take care of everybody that I can."

On December 21, 2006, the State filed a criminal information against Tarray, in the Circuit Court for Charles County, alleging multiple counts of theft, forgery, uttering, conspiracy, and exploitation of a vulnerable adult.[5] At trial, Tarray's counsel moved for judgment of acquittal on the charge of exploitation of a vulnerable adult and conspiracy to commit the offense based, solely, upon the argument that the evidence did not support a finding of undue influence. In particular, counsel for Tarray stated:

> Additionally . . . the third element of the charge . . . is that [Tarray] obtained property of the victim by using deception, intimidation or undue influence[.] I would argue . . . that there was money . . . exchanged between [Wright] and [Tarray]. However, [Wright] did not testify that there were any threats or coercions during these [exchanges]. He did testify that the money was given because . . . the work was very hard. [Also Wright] . . . testified that he was caught between a rock and a hard place. I don't think that that would constitute undue influence. The definition of due [sic] influence is domination and influence amounting to force and coercion exercised by another person to such an

---

5. The record does not indicate how and when the matter was brought to the attention of local law enforcement.

extent that a vulnerable adult was prevented from exercising free judgment and choice.

In this case, [Wright's] free judgment and choice was not over ... he was not prevented from exercising this free judgment and choice.... He never mentioned that there were any threats in exchange for ... being fed or a catheter being changed, for example.

There was no testimony whatsoever on behalf of [Wright] to indicate that ... any of [Tarray's] behaviors prevented him from exercising free judgment or choice.

Should I just go through all of the counts, Your Honor?

In denying Tarray's motion, the trial judge concluded that a fact finder would be justified in finding undue influence under the totality of the circumstances. Also, the judge noted that Tarray charged excessive wages, opened bank accounts in Wright's name without authorization, caused Wright to purchase a truck for Tarray's personal use, and secured rights to Wright's house and truck. In the trial judge's assessment of the facts, the jury could infer that Wright's decisions were the result of undue influence.

Following deliberations, the jury returned verdicts of guilty against Tarray for, *inter alia*, two counts of theft, one count of exploitation of a vulnerable adult, and one count of conspiracy to exploit a vulnerable adult.[6] The trial judge sentenced Tarray to a term of five years incarceration, with all but one year suspended, and four years of probation. Tarray then filed a timely appeal to the Court of Special Appeals. Before the intermediate appellate court could consider the matter, we granted *certiorari*[7] on our own motion to answer the following question: Is the evidence sufficient to sustain the convictions

---

6. The appellant was indicted on a total of 13 counts. Prior to closing arguments, however, the trial judge granted motions for judgment of acquittal on counts eight through 13. The remaining counts, three, five, and six, were *nolle prossed*.

7. Because there is no prior appellate decision, the party appealing the decision is referred to as the appellant, whereas the adverse party is referred to as the appellee. Md. Rule 8–111(a).

for exploitation of a vulnerable adult and conspiracy to exploit a vulnerable adult?

## II.

## A.

■ At the outset, we note that Tarray does not present an argument challenging the trial court's findings as to any element of the conspiracy charge, other than the intent to accomplish the exploitation of a vulnerable adult.[8] Thus, her challenge to the legal sufficiency of the evidence to sustain the conviction depends solely upon whether we conclude that the evidence was sufficient to support the conviction for exploitation of a vulnerable adult.[9] In addition, we note that Tarray, on appeal, concedes that Wright is a vulnerable adult. Therefore, our decision in this case turns ultimately on whether Tarray obtained Wright's property by deception or undue influence.[10]

---

8. To successfully prove a conspiracy to exploit a vulnerable adult, the State must establish (1) an unlawful agreement entered in between two or more persons (2) to deprive a vulnerable adult of the vulnerable adult's property by deception, intimidation, or undue influence. *See Mitchell v. State*, 363 Md. 130, 145, 767 A.2d 844, 852–53 (2001) (citing *Johnson v. State*, 362 Md. 525, 766 A.2d 93 (2001)) (describing offense of conspiracy).

9. To successfully prove exploitation of a vulnerable adult, the State must establish that: (1) the victim is a vulnerable adult; (2) the defendant knew or reasonably should have known that the victim was a vulnerable adult; (3) the defendant knowingly and wilfully obtained the victim's property by deception, intimidation, or undue influence; and (4) the defendant intended to deprive the victim of his or her property. § 8–801(b) of the Criminal Law Article.

10. Because the State did not raise the issue of intimidation during closing at trial, let alone present evidence on the issue at trial, we shall not address whether Tarray obtained Wright's property by intimidation. Md. Rule 8–131(a) (providing that reviewing courts will not decide an issue unless the record shows that the issue was raised in, or decided by, the trial court); *Robinson v. State*, 404 Md. 208, 216, 946 A.2d 456, 461 (2008) (citing *Burch v. United Cable*, 391 Md. 687, 695, 895 A.2d 980, 984 (2006); *Fitzgerald v. State*, 384 Md. 484, 505, 864 A.2d 1006, 1018 (2004)).

## B.

### *Parties' Contentions*

Tarray contends that the evidence presented at trial was legally insufficient to sustain her convictions for exploitation of a vulnerable adult and conspiracy to exploit a vulnerable adult. She argues that a rational trier of fact could not have found, beyond a reasonable doubt, the essential elements of either offense because the evidence did not suggest that she obtained Wright's property by any one of the three modalities described in the statute.[11]

As to the modality of undue influence, Tarray maintains that she never prevented Wright from exercising his free will. Indeed, Tarray asserts that her accumulation of Wright's property over the course of her employment was merely the result of her assertiveness in repeatedly seeking the most favorable terms possible. In regard to the modality of deception, Tarray maintains that the State never raised the issue at trial. She reasons that the State only proceeded on a theory of undue influence and that the trial judge only sent the statutory definition of undue influence to the jury. Furthermore, even if the State raised the issue of deception, Tarray contends that she did not obtain Wright's property by deception because she never misled Wright in order to take any of his property.

The State retorts that the evidence was legally sufficient to sustain the conviction as to counts one and two.[12] Specifically, the State contends that the jury could have reasonably found

---

**11.** The statute prohibits a person from obtaining a vulnerable adult's property "by *deception, intimidation, or undue influence.*" Md.Code. Ann. (1957, 2002 Repl.Vol.), § 8–801(b) of the Criminal Law Article (emphasis added).

**12.** The criminal information provides, in relevant part:

Count 1

[The] State's Attorney for Charles County, Maryland, on his oath and information does present that ADELAIDA MARIA TARRAY, late of said County, between on or about the 15th day of May and 27th day of December, two thousand and five, at Charles County, Maryland, did unlawfully, knowingly and willfully obtain by deception,

that Tarray obtained Wright's property by either undue influence or deception. In response to Tarray's argument regarding the lack of evidence as to undue influence, the State points to the totality of the circumstances, including permissible inferences deducible from the evidence. Specifically, considering the evidence that Tarray obtained excessive wages, opened two checking accounts and obtained a credit card without authorization, and secured both a present interest in Wright's home and a future interest in Wright's truck, the State maintains that a reasonable jury could have inferred the presence of undue influence. In addition, although the State did not rely in its brief on the modality of deception to sustain the conviction, it maintains, at oral argument, that a reasonable jury could have found that Tarray deceived Wright causing him to relinquish his property. Moreover, the State contends that Tarray's conviction for theft is sufficient to sustain her conviction for exploitation of a vulnerable adult.

## C.

■ In determining whether the evidence is legally sufficient, we examine the record solely to determine whether "any

intimidation and undue influence property having a value of greater than five hundred dollars, the property of John Wright, knowing and reasonably should have known that the said John Wright was a vulnerable adult with the intent to deprive the said John Wright of the said John Wright's property, in violation of Article CR, Section 8–801 of the Annotated Code of Maryland, and against the peace, government and dignity of the State. (Exploitation Vulnerable Adult, Article CR, Section 8–801)

Count 2

And the said State's Attorney, on his oath and information aforesaid, further presents that the said ADELAIDA MARIA TARRAY, late of said County, between on or about the 15th day of May and 27th day of December, two thousand and five, at the County aforesaid, did conspire with David Baker to unlawfully, knowingly and willfully obtain by deception, intimidation, and undue influence property having a value of greater than five hundred dollars, the property of John Wright, knowing and reasonably should have known that the said John Wright was a vulnerable adult with the intent to deprive the said John Wright of the said John Wright's property, in violation of Common Law and the peace, government, and dignity of the State. (Conspiracy—Exploitation Vulnerable Adult, Common Law)

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McKenzie v. State,* 407 Md. 120, 136, 962 A.2d 998, 1007 (2008) (citing *Jackson v. Virginia,* 443 U.S. 307, 315–16, 99 S.Ct. 2781, 2786–87, 61 L.Ed.2d 560, 571 (1979) (requiring legal sufficiency in order to sustain a conviction)). In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State. *State v. Rendelman,* 404 Md. 500, 513–14, 947 A.2d 546, 553 (2008) (citing *Harrison v. State,* 382 Md. 477, 487–88, 855 A.2d 1220, 1226 (2004)); *State v. Suddith,* 379 Md. 425, 429–31, 842 A.2d 716, 718–19 (2004) (citing *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664, 668 (2003)). Moreover, we will ordinarily defer to the factual findings of the trier of fact, who is able to observe the demeanor of the witnesses and weigh their credibility. *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359, 1366–67 (1991).

### *Theft Conviction*

We begin our analysis by addressing whether Tarray's theft conviction is sufficient to support her conviction for exploitation of a vulnerable adult. Section 8–801 provides, in part, that "a person may not knowingly and willfully obtain by deception, intimidation, or undue influence the property of an individual that the person knows or reasonably should know is a vulnerable adult with intent to deprive the vulnerable adult of the vulnerable adult's property." § 8–801(b) of the Criminal Law Article. In construing language of a statute, we are guided by the principles of statutory construction. As stated recently:

> In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional, or part of the Rules." We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugato-

ry.'" If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If, however, the language is subject to more than one interpretation ... we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute.

*Glascoe & Jackson v. State,* 408 Md. 231, 236–37, 969 A.2d 277, 280–81 (2009) (quoting *Firefighters v. Cumberland,* 407 Md. 1, 8–9, 962 A.2d 374, 378–79 (2008); *Doe v. Board of Elections,* 406 Md. 697, 712, 962 A.2d 342, 350–51 (2008); *Supervisor v. Stellar GT,* 406 Md. 658, 669–70, 961 A.2d 1119, 1125–26 (2008)).

In the present case, the State maintains that the legislature intended to treat § 8–801 as an aggravated offense of theft by providing for the prosecution of non-fiduciaries who "were able to take" the property of a vulnerable adult. In other words, a person who commits a theft against a vulnerable adult, even where there is no deception, intimidation, or undue influence, is also in violation of § 8–801. In response, Tarray contends that the State's contention is without merit, because its interpretation is both unpersuasive and unreasonable. Tarray asserts that it is highly unlikely that the legislature intended to treat the phrase "by deception, intimidation, and undue influence" as meaningless after devoting its time and effort to illustrate what it meant by providing a statutory definition for two of the three terms. Even if the statute were susceptible to both interpretations, Tarray further contends that the legislative history underlying § 8–801 is silent on the issue of whether a theft offense against a vulnerable adult is sufficient to establish the offense of exploitation of a vulnerable adult.[13] Additionally, Tarray contends that even though there are similar at-risk adult abuse statutes in other jurisdic-

---

13. Although the legislative history underlying § 8–801 devotes considerable attention to which persons are subject to punishment, it does not, contrary to the view of the State, expressly address whether the statute applies to persons who steal from a vulnerable adult when there is no deception, intimidation, or undue influence.

tions, the wording of the Maryland statute at issue implicitly refutes the State's aggravated offense theory.[14]

Because the State's interpretation would unreasonably constrain the plain meaning of the statute by reading out the phrase "by deception, intimidation, or undue influence," we agree with Tarray's construction of the statute. *See Department of Health v. Kelly*, 397 Md. 399, 420, 918 A.2d 470, 482 (2007) (construing statutes "so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory") (citing *Oakland v. Mountain Lake*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *Mazor v. State, Dep't of Correction*, 279 Md. 355, 360–61, 369 A.2d 82, 86–87 (1977)). In rejecting the State's contention, we conclude that the General Assembly intended to treat the crimes of theft and exploitation of a vulnerable adult as separate and distinct offenses.

## Undue Influence

 Next, we turn to the issue of whether Tarray obtained Wright's property by undue influence. The statute defines undue influence as "domination and influence amounting to *force and coercion* exercised by another person to such an extent that a vulnerable adult was prevented from exercising free judgment and choice." § 8–801(a)(7)(i) of the Criminal Law Article (emphasis added). One may infer coercion from the totality of the facts and circumstances surrounding the transfer of property. *See Winder v. State*, 362 Md. 275, 307, 765 A.2d 97, 114 (2001) (explaining that we determine whether

---

**14.** Even though most states provide some form of protection against the exploitation of elders or vulnerable adults, only a few states have enacted criminal statutes that punish such conduct. *See, e.g.,* Ark.Code Ann. § 5–28–103 (2006); Colo. Rev. Stat. Ann. § 18–6.5–103(5) (West 2004); Ga.Code Ann. § 30–5–8 (2007); Kan. Stat. Ann. § 21–3437 (2002); Minn.Stat. Ann. § 609.2325 (West 2009); Vt. Stat. Ann. tit. 13, § 1380 (2008). Meanwhile, other states have taken the approach of enhancing the penalties for theft crimes against elders or vulnerable adults. *See, e.g.,* Ariz.Rev.Stat. Ann. § 13–702(c)(13) (2001); Cal.Penal Code § 368 (West 2009); D.C.Code Ann. § 22–3601 (2001); 730 Ill. Comp. Stat. § 5/5–5–3.2 (West 2007); Nev.Rev.Stat. § 193.167 (Lexis-Nexis 2006); Okla. Stat. tit. 22, § 991 a–17 (West 2003).

a confession was obtained by the exercise of free will or coercion by considering the extant circumstances affecting the suspect's interrogation and confession).

In the present case, Tarray contends that she never forced nor coerced Wright into relinquishing any property, including his truck or house. Accordingly, she maintains that Wright's free will was never overborne. Because Wright remained free from any force or coercion to make decisions on his own, Tarray asserts that she did not unduly influence Wright causing him to relinquish his property. *See Figgins v. Cochrane*, 403 Md. 392, 411–14, 942 A.2d 736, 747–49 (2008) (explaining that the presumption of undue influence in a will contest case can be rebutted by showing that, in view of the circumstances, the transfer was voluntary). In contrast to Tarray's contention, the State maintains that the jury, reasonably, could have inferred from the totality of the circumstances that Wright's free will was overborne.

We note that although the circumstances surrounding the transfer of interest and possession with respect to the truck and house provide the State with its strongest argument in support of the presence of undue influence, any argument based on these circumstances fails. Wright's testimony rejects the notion that Tarray obtained the truck or house by "domination and influence amounting to force and coercion." At trial, Wright testified that he agreed to provide transportation and housing for Tarray because he felt obligated to do so out of a sense of loyalty in view of the benefit received from Tarray for prior services rendered. Wright's decision to part with his property in the way he did may seem unreasonable, but his testimony shows that he did so because of his own judgment rather than "force and coercion" to the extent that a vulnerable adult could not exercise his or her free will. *Cf. State v. Maxon*, 32 Kan.App.2d 67, 79 P.3d 202, 207–08 (2003) (concluding that the evidence was sufficient to show undue influence where the defendant orchestrated the transfers to coincide with the vulnerable adult's "manic or 'giving' periods"). Even though Wright was "between a rock and a hard place," as he testified, he still had the benefit of a choice.

Therefore, we conclude that the evidence was insufficient to support the conclusion that Tarray unduly influenced Wright, causing him to relinquish his property.

*Deception*

Section 8–801(a)(2) of the Criminal Law Article provides that "deception" has the meaning as stated in § 7–101 of that article. According to § 7–101, deception occurs when, among other acts, a person knowingly either "create[s] or confirm[s] in another a false impression that the offender does not believe to be true [or] fail[s] to correct a false impression that the offender previously has created or confirmed." At the outset, we expressly reject Tarray's contention, made during oral argument before us, that proof of theft by deception or exploitation of a vulnerable adult requires proof that the victim was actually aware that he or she was being deceived. Detrimental reliance is not an element of theft by deception or exploitation of a vulnerable adult. We consider the plain language of both the theft and exploitation of a vulnerable adult statutes (as confirmed by the legislative history of the theft statute) and conclude that both statutes require proof of the offender's intent to mislead, not proof that the victim was mislead. *See Cardin v. State*, 73 Md.App. 200, 222, 533 A.2d 928, 939 (1987) (holding that, in light of the plain language of the statute and its legislative history, Maryland's consolidated theft statute does not require detrimental reliance as an element of the crime of theft by deception).

Tarray further contends that the State did not prove exploitation of a vulnerable adult because it did not establish the element of deception. Specifically, Tarray maintains that the State proceeded only on the modality of undue influence in attempting to prove exploitation of a vulnerable adult. According to Tarray, the record supports her position because the jury instruction given did not contain a statutory definition for any term other than undue influence, and the prosecution's closing argument focused substantially on undue influence. Thus, Tarray contends, at oral argument before this Court, that the State failed to preserve the issue of deception and

thereby waived the argument that the evidence is sufficient as to the element of deception.

 Tarray's contention is fatally flawed because, rather than the State failing to preserve the issue for appeal, Tarray failed to preserve her argument as to the sufficiency of the evidence of deception by failing to object, with particularity, at the time of trial. Fundamentally, when moving for a judgment of acquittal at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence, the defendant must state with particularity all the reasons why the motion should be granted. Md. Rule 4–324(a); *Muir v. State*, 308 Md. 208, 218–19, 517 A.2d 1105, 1110 (1986). This Tarray failed to do as to the sufficiency of the evidence to prove deception.

Tarray contends, for the first time, that the evidence was insufficient to support a finding of deception. The record, however, reveals that at the close of the State's case, Tarray moved only for a judgment of acquittal as to the sufficiency of the evidence to prove undue influence. Tarray's counsel said, "[Wright] did not testify that there were any threats or coercions. . . . [H]e was not prevented from exercising . . . free judgment and choice" and that she did not "think that that would constitute undue influence." Moreover, at the close of all the evidence, Tarray's counsel said, "Okay. I did want to . . . renew my motion for judgment of acquittal." Later, she said, "And, I suppose I'd just . . . incorporate the same arguments from the original motion for judgment of acquittal."

Because Tarray's motion neither challenged nor mentioned the sufficiency of the evidence to prove deception, Tarray failed to articulate to the trial judge this contention that is being raised for the first time on appeal. Accordingly, Tarray did not state with particularity all the reasons why the trial judge should have granted the motion. *Muir*, 308 Md. at 219, 517 A.2d at 1110 (citing *State v. Lyles*, 308 Md. 129, 517 A.2d 761 (1986)). Thus, we conclude that Tarray did not preserve

for appellate review her argument regarding the sufficiency of the evidence as to the element of deception.

Tarray acknowledges that the State may prove exploitation of a vulnerable adult by any one of the three modalities prescribed in the statute, but she contends that the State failed to raise the issue of deception at trial and thereby did not preserve the issue for appeal. According to Tarray, the record supports this theory because the jury instruction given did not contain a statutory definition for any term other than undue influence, and the prosecution's closing argument focused substantially on undue influence.

The record, however, clearly refutes this theory in several respects. First, the criminal information charged Tarray with violating § 8–801 [15] and tracked the specific language of the statute. Because the statute is drawn in the disjunctive, the State was entitled to prove the offense by any one of the prescribed modalities, including deception. Second, although Tarray correctly points out that the jury was only given the statutory definition of undue influence before closing arguments, she conveniently overlooks the fact that the jury instruction provided that the State may prove that Tarray obtained Wright's property by any one of the three modalities.[16] Moreover, at closing argument, the prosecutor said, "The Defendant obtained property of the victim by using deception, intimidation or undue influence . . . ." Thus, we con-

---

**15.** The statute provides, in relevant part:

(b) *Prohibited.*—A person may not knowingly and willfully obtain *by deception, intimidation, or undue influence* the property of an individual that the person knows or reasonably should know is a vulnerable adult with intent to deprive the vulnerable adult of the vulnerable adult's property. (Emphasis added.)

§ 8–801(b) of the Criminal Law Article.

**16.** When instructing the jury on count one, the trial court judge stated:

In order to convict [Tarray] of this offense, the State must prove the following things: (1) the victim was a vulnerable adult; (2) [Tarray] knew the victim was a vulnerable adult; (3) [Tarray] obtained property of the victim *by using deception, intimidation or undue influence* to obtain the property; (4) [Tarray] intended to deprive the victim of the property. (Emphasis added).

clude that the State did not waive the argument that the evidence is sufficient as to the element of deception.

The record reveals at least two separate instances involving Tarray's deceptive conduct, either of which is sufficient to support the jury's conclusion that Tarray obtained the vulnerable adult's property by deception. First, there is evidence that Tarray opened several unauthorized bank accounts using Wright's name. Specifically, Tarray opened a Bank of America checking account and used it in place of Wright's initial Bank of America checking account. Tarray opened the account over the phone by misleading account representatives into believing she (Tarray) was authorized to open the account for Wright. Except for the initial payment in cash, Wright paid Tarray weekly by personal check—from his initial Bank of America account—not the one opened by Tarray. As Wright's health declined over time, Tarray began preparing the checks for Wright to sign. Tarray continued to prepare her own paychecks for Wright's signature at the end of every pay period.

On December 22, 2005, however, Tarray deviated from the course of practice when she presented Wright with a check, for purposes of obtaining his signature, in the amount of $1,000, bearing the same address as earlier checks. Unlike the earlier checks, however, the check for $1,000 was written on a different account. By misleading Wright into believing that he had signed a check drawn on his authorized account, Tarray created a false impression in Wright that Tarray knew was not true. Although Tarray may have been entitled to compensation for services rendered, she was not entitled to deceive Wright into paying her by creating, and then failing to correct, the false impression in Wright that he was signing a personal check drawn on the account that he had opened initially and authorized. Second, there is evidence that over the course of Tarray's employment that Tarray earned well over $24,000, without any tax withholdings. Generally, employers are required to withhold federal and state payroll taxes. *See Cent. Ill. Public Serv. Co. v. United States,* 435 U.S. 21, 24–25, 98 S.Ct. 917, 919–20, 55 L.Ed.2d 82, 86–87

(1978) (discussing tax withholdings); *see also Shanks v. Lowe,* 364 Md. 538, 542, 774 A.2d 411, 413 (2001) (requiring reports on the amount of tips received for withholding purposes). Wright testified that he intended to deduct taxes from Tarray's paychecks, but he admitted that he did not know enough to do so. He testified that Tarray informed him that she knew how to make the calculations and would make the deductions. Tarray never made the withholdings. A reasonable jury could have inferred, from the evidence, that Wright was under the impression that he had delegated the duty to withhold payroll taxes to Tarray. Further, the jury could have concluded that Tarray had no intention to withhold taxes and deceived Wright by failing to make the deductions. Considering the totality of the circumstances, a reasonable jury could have inferred deception from the fact that Wright trusted Tarray and she failed to handle Wright's affairs competently and honestly. Also a reasonable jury could have found that Wright was deceived when Tarray opened various unauthorized accounts, named herself as the authorized credit card holder on the Citigroup account, and made cash withdrawals.

Based upon our review of the State's evidence, including all reasonable inferences drawn therefrom, in a light most favorable to the State, we conclude that a rational trier of fact could not have found the element of undue influence beyond a reasonable doubt. Nevertheless, because Tarray waived any argument regarding the sufficiency of the evidence to support a finding of deception, using the same standard of review, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, the element of deception. Thus, we hold that the evidence was legally sufficient to sustain the convictions for exploitation of a vulnerable adult and conspiracy to exploit a vulnerable adult.

*JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.*

HARRELL, BATTAGLIA and BARBERA, JJ., Concur.

Concurring Opinion by HARRELL, J., which BATTAGLIA and BARBERA, JJ., join.

I concur fully with the analysis in the Majority opinion regarding affirming Tarray's conviction for exploitation of a vulnerable adult based on the deception modality of committing the crime. I write separately, however, to register my disappointment with the Majority opinion's conclusion that there was insufficient evidence for the jury also to conclude, beyond a reasonable doubt, that Tarray exerted undue influence over her victim.

A reader may wonder (reasonably) why I write separately where the conviction at issue is affirmed, a result to which I subscribe. I write because it is my view that it is especially important prospectively for the Court carefully and correctly to interpret this statute. This is the Court's first opportunity to consider the Exploitation of a Vulnerable Adult statute, Maryland Code (2002 Repl.Vol., 2008 Supp.), Criminal Law Article, § 8–801.[1] Faced with a large aging population in this country and in our State, I predict that the courts likely will see an increase in prosecutions involving exploitation of vulnerable adults. While advanced age does not, in and of itself, necessarily equate with vulnerability, vulnerability often accompanies aging.[2]

I would affirm Tarray's conviction for exploitation of a vulnerable adult also on the ground that the evidence was sufficient to prove undue influence.

[W]e review a challenge to the sufficiency of the evidence in a jury trial by determining whether the evidence, viewed in a light most favorable to the prosecution, supported the conviction of [Appellant], such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

---

1. All citations, unless otherwise indicated, are to the Criminal Law Article.

2. A vulnerable adult will not always be a senior citizen. Wright, the victim here, was only fifty years of age at the time of the offense here.

*Allen v. State,* 402 Md. 59, 76–77, 935 A.2d 421, 431 (2007). "It is not the province of an appellate court to retry the case; rather, we review the evidence and all inferences in a light most favorable to the State." *Id.* at 77, 935 A.2d at 431. "We give 'due regard to the [jury's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.' " *State v. Smith,* 374 Md. 527, 534, 823 A.2d 664, 668 (2003) (quoting *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821, 827 (2002)).

The Majority concludes that the evidence was insufficient to support Tarray's conviction on the ground that Tarray unduly influenced Wright. In so concluding, the Majority necessarily resolves that the jury could not have concluded reasonably, from the totality of the evidence and any reasonable inferences therefrom, that Tarray influenced unduly Wright to give her thousands of dollars over a period of seven months. Section 8–801 defines undue influence as "domination and influence amounting to force and coercion exercised by another person to such an extent that a vulnerable adult was prevented from exercising free judgment and choice." § 8–801(a)(7)(i).

Although the transactions involving the truck and the home occurred outside the time period specified in the criminal information, there remained sufficient evidence that could convince a rational fact finder of Tarray's guilt under the undue influence standard. For example, as noted by the Majority opinion (Maj. Op. at 611–12, 979 A.2d at 739), Wright expressed in his testimony that he agreed to the demanded increases in Tarray's salary because he felt as if he was between a rock and a hard place. He explained that he was in that position because if he "didn't have [Tarray] . . . where would I go?" At that point in his testimony, the trial judge ordered a recess because the witness had become "extremely emotional." When testimony resumed, Wright stated that, in order to survive, he needed help in his house. He also indicated that he lost contact with his family as a result of the separation from his wife.

The Majority characterizes Wright's position, "in between a rock and a hard place," as including a choice and that the manner in which he disposed of his property was the result of inferentially bad judgment, rather than "force and coercion." Maj. Op. at 611–12, 979 A.2d at 739. Although that is not an unreasonable conclusion, it equally was reasonable for the jury to infer from his testimony and demeanor on the witness stand that Wright believed he did not have a choice as a result of Tarray's manipulation and influence, despite what he said on the witness stand. Wright is paraplegic and needs assistance with dressing himself, preparing food, basic toilet functions, and getting in and out of bed. The jury could have concluded reasonably that Wright believed if he did not give Tarray what she wanted, she would have left him and he would not have anyone else to care for him. Put in context, a rational jury could have concluded that, although Wright may have "wanted" to give her more money so that she would continue caring for him, her manipulative demands (in his situation) prevented him from exercising free judgment and choice because she led him to believe she would leave if he did not comply with her demands and that he would not be able to find anyone else to care for him.

Instead, the Majority usurps the jury's function and appropriates to itself the role of an appellate jury. On a sufficiency of the evidence question, our duty is to "give 'due regard to the [jury's] findings of fact, its resolution of conflicting evidence, and significantly, its opportunity to observe and assess the credibility of witnesses.'" *Smith,* 374 Md. at 534, 823 A.2d at 668 (quoting *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821, 827 (2002)). The Majority opinion, however, substitutes itself in place of the jury. Viewed in a light most favorable to the State, a rational trier of fact could have found the essential element of undue influence beyond a reasonable doubt.

Accordingly, although I concur with the judgment of the Majority opinion and its affirmance of the relevant conviction on deception grounds, I would further hold that there was

sufficient evidence to sustain the conviction on the ground of undue influence.

Judges BATTAGLIA and BARBERA authorize me to state that they join this concurrence.